```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA,              :
                                       :
                Plaintiff,             :         **OPINION**
                                       :
      -vs.-                            :         02-CR-1236 (LBS)
                                       :
JOHN RIGAS, et al.,                    :
                                       :
                Defendants.            :
-----------------------------------------------------x
```

SAND, District Judge:

Defendants John J. Rigas and Timothy J. Rigas have moved for a new trial pursuant to F.R. Crim. Proc. 33 on the grounds that "the government's central witness gave perjured testimony, without which the Rigases likely would not have been convicted." (Def. Mot. at 1). Defendants argue that testimony given by James Brown at civil proceedings held subsequent to the criminal trial demonstrate that Brown's testimony at the criminal trial was perjurious. In particular, defendants cite to passages of Brown's trial testimony relating to his dealings with Adelphia's outside auditors, Deloitte & Touche ("Deloitte") and his allegedly inconsistent testimony at subsequent SEC proceedings against one of Adelphia's auditors, Gregory Dearlove ("Dearlove") and the acquitted co-defendant, Michael Mulcahey.

The government opposes the motion on the grounds that Brown testified truthfully at the criminal trial, and asserts that the evidence is not newly discovered and the jury's verdict would not have been different had it considered the allegedly conflicting testimony. We consider those issues herein.

**I. Standard**

The Second Circuit has stated that the test for granting a new trial based on newly discovered evidence is as follows:

> First, the motion will not be granted unless the newly discovered evidence could not with due diligence have been discovered before or during the trial …. Second when the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury …. Third the newly discovered evidence must be material….Fourth, consideration must also be given to whether the newly discovered evidence is cumulative, that is simply additional evidence to that which was presented at trial as to a fact, or unique evidence that tends to prove a fact at issue. [Fifth, the Court must consider] the effect the evidence would have on the jury's verdict had it been submitted at [the] trial."

United States v. Garcia, 2003 U.S. Dist. LEXIS 11894, *7-8 (S.D.N.Y. 2003) (citing United States v. White, 972 F.2d 16, 20-21 (2d Cir. 1992) (alterations in original).

Where the newly discovered evidence indicates possible perjury by a trial witness, the Court must first decide whether perjury has actually occurred. See United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1997) ("In order to grant a new trial based on newly discovered evidence of trial perjury, the [defendants] must first demonstrate that the witness in fact committed perjury"). "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." See United States v. Dunnigan, 507 U.S. 87, 94 (1993). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." United States v. Sanchez, 969 F.2d 1409, 1414-15 (2d Cir. 1992). However, "[e]ven where newly discovered evidence indicates perjury, motions for new trials should be granted only with

great caution and in the most extraordinary circumstances." United States v. Mason, 201 Fed. Appx. 22 (2d Cir. 2006).

**II. Alleged Perjury by James Brown**

Defendants assert that "Brown's testimony was heavily concentrated on the Rigases' alleged efforts to mislead Adelphia's outside auditor Deloitte." (Def. Mot. at 15). The government characterizes this as being a "false straw man," and argues that it was not the government's claim nor Brown's testimony that he deliberately misled Deloitte on <u>all</u> <u>matters</u>. (Govt. Br. at 22).

Defendants offer the following contrast as proof of Brown's alleged perjury. First, they note that in his opening testimony, Brown stated that he lied "about a number of things," (Tr. 6070-71), and that in his concluding testimony, he answered "yes" to a cross examination question asking whether he had "lied ... to banks and investment bankers and lawyers and accountants and sophisticated analysts and all kinds of people." Defendants argue that this testimony is inconsistent with the following testimony Brown gave at the SEC proceeding against one of Adelphia's outside auditors:

> Q: Did you lie to the auditors about the co-borrowing agreements and how the debt was reflected on the books and records of Adelphia and the Rigas entities?
>
> A: No.
>
> Q: Did you lie about the gross amounts of related party receivables and payables reflected on the books and records of Adelphia?
>
> A: No.
>
> Q: Did you lie about the existence of the cash management system?
>
> A: No.

> Q: Did you lie about debt reclassifications?
>
> A: No.
>
> Q: Or about direct placements of stock to the Rigases?
>
> A: No.
>
>         \*\*\*
>
> Q: Did you direct any Adelphia employee to withhold any document requested by the engagement team relating to the co-borrowed debt?
>
> A: No.
>
> Q: Did you direct anyone to withhold documents relating to the gross amounts of related party receivables or payables as they were reflected on the books and records of Adelphia?
>
> A: No.
>
> Q: Did you direct anyone to withhold any documents relating to the debt reclassifications or the direct placements?
>
> A: No.
>
> Q: In connection with the 2000 audit, are you aware of any document that was [sic] withheld by any Adelphia employee relating to any of those items; specifically, the co-borrowed debt, the related party receivables, the direct placements, the debt reclassification?
>
> A: No.

(Dearlove Tr. 84-85).

However, the government argues, and this Court agrees, that defendants' arguments are founded on the false premise that Brown testified that he had actively lied to Deloitte about every matter he discussed with them. Defendants contrast the broad statement at the criminal trial that Brown had lied to accountants with the questions at the SEC proceeding whether he had lied to Deloitte about certain specific matters. At the

same SEC proceeding, when Brown was asked specific questions, he admitting lying to the auditors "about the EBITDA" and answered "yes" to the question of whether he "did things to deceive the auditors in the year 2000." (Dearlove Tr. 168). Furthermore, his testimony at the criminal trial was consistent with his SEC testimony, in that he stated that "the lies were a variety of formats. Some were just blatant falsehoods, some were half-truths, a lot of them were half-truths, and some of them were just withholding material information that would have been important to investors that made decisions." (Tr. 6071). Never at trial did Brown assert that he had deliberately, affirmatively lied to the auditors on <u>every</u> matter.

With respect to debt reclassification, Brown testified at the criminal trial that "[t]he auditors didn't know about [the reclassifications]." (Tr. 6541-44). In the subsequent SEC proceeding, Brown testified that he did not lie about debt reclassification. (Dearlove Tr. 84). It is difficult to perceive how this testimony reflects perjury on Brown's part, let alone any suggestion that the government knew or should have known that Brown's testimony about the auditors' ignorance was false. (Def. Reply Br. at 16).

Without detailing all of the Defendant's allegations that Brown testified inconsistently at the criminal and civil proceedings, it suffices to say that the government has persuasively demonstrated that none of defendants' specific claims concerning Brown's testimony at subsequent civil proceedings supports the claim that his testimony in the criminal case was perjurious. (See Govt. Br. at 22-38). Several examples of defendants' alleged inconsistencies are discussed below, however, this list is not exhaustive. Ultimately, this Court is satisfied that the government did not claim, nor did

Brown testify, that he personally lied to Deloitte about every one of the means by which the Rigases manipulated Adelphia's public disclosure to deceive the public. Accordingly, none of defendants' cited inconsistencies rises to the level of perjury. It is also worth noting, as the government points out, that Brown was not the sole witness to testify with respect to the defendants' fraudulent practices. See e.g., testimony of Chris Tarner (Tr. 4377-87); James Helms. (Tr. 4378-87).

      i. Debt Reclassification

The trial testimony with respect to debt reclassification related to two different types of reclassifications: (1) reclassification effected by journal entries between the Rigas' managed enterprises ("RME's") and Adelphia; and (2) reclassification in connection with certain purchases of Securities by Rigas entities. As to the second class of reclassifications, the testimony established that two other Adelphia employees, James Helms and Michael Mulcahy, made or directed making the relevant entries and Brown learned of them after they had been made. Viewed in this context, Brown's "never rang a bell with me" testimony, (Dearlove Tr. 159-60), is not indicative of prior perjury on his part.

      ii. Underwater

Defendants cite Brown's trial testimony that for the periods 1999-2001 the Rigases were "underwater," (Crim Tr. 6585-86), as being perjurious in light of his testimony at the Dearlove and Mulcahy SEC hearings. (Def. Mot. at 18-19). However, as the government demonstrates, the defendants' comparisons conflate the question of whether Brown believed the Rigas family partnerships were underwater (comparing their total assets to their total liabilities) with the question of whether the Rigases had

sufficient assets to pay their share of co-borrowed debt. (Govt. Br. at 33). At the Rigases' trial, Brown testified that a schedule he prepared in April 2002 showed an excess of Rigas family assets over co-borrowed debt. (Tr 7249 - 82; Ex. 1600).

      iii. <u>Immediate Available funds</u>

At the criminal trial, Brown testified that Adelphia's public disclosure represented that in exchange for the stock and bonds it sold to the Rigas family, Adelphia received "immediate available funds, which means cash." (Tr. 6732). Defendants contrast this testimony with Brown's testimony in the Mulcahy proceeding. In the Mulcahy proceeding, Brown was asked whether there was a difference to him "between cash and assumption of debt as a means of purchasing securities." (Mulcahy Tr. 222). Brown responded that "I was generally aware that, to the auditors, it mattered if cash moved in numerous transactions." (Mulcahy Tr. 84-85) Brown's personal view of the meaning of "immediately available funds" and his understanding of how auditors would interpret that phrase hardly support a claim that Brown's trial testimony was perjurious.

      iv. <u>Other Witnesses</u>

Defendants also cite inconsistencies between Brown's trial testimony and the testimony given at the post-trial SEC proceedings by other Adelphia employees. This testimony largely consists of the witnesses denying knowledge or complicity in transactions which Brown testified were a part of the defendants' concealment or misrepresentations. Putting aside the question (addressed below) of whether evidence of such testimony constitutes newly discovered evidence, the Court fails to see how such testimony is sufficient evidence to demonstrate that Brown testified perjuriously.

Finally, defendants argue that misleading statements made by a witness, even if not technically perjurious, can have the same effect on the jury as outright perjury. (Def. Reply. Br. at 4). The cases defendants cite for this proposition are not controlling within this jurisdiction, and the Court finds this argument wholly without merit. This Court will not reverse a conviction on the basis of perjury by a witness without finding that the witness did, in fact, commit perjury.

**III. The Evidence Defendants Cite is Not Newly Discovered**

The government also contends that the testimony relied on by the Rigases is not newly discovered evidence. Defendants argue, first, that because Brown's testimony in subsequent proceedings conflicts with his trial testimony, it should be considered newly discovered evidence. As discussed below, this argument can only succeed when the testimony in question demonstrates knowing, material perjury, which it does not do here. Further, defendants argue that because the certain witnesses "refused to cooperate with defense counsel before and during trial, despite counsel's efforts to secure their testimony, the witness' subsequent testimony in civil depositions should be considered newly discovered evidence." (Def. Mot. at 42). This argument is contrary to clear law in this jurisdiction, and therefore must fail.[1]

A. <u>Testimony from Brown</u>

The defendants assert that Brown's subsequent inconsistent testimony must be considered newly discovered "because it was not known at the time of trial that Brown

---

[1] Defendants also assert that even if their evidence is not newly discovered, it "is still highly relevant" to the Motion and "must be considered by the Court" because it demonstrates that Brown's criminal trial testimony was false. This proposition is simply incorrect. Under Rule 33, only newly discovered evidence may form the basis for a motion for a new trial, unless the motion is made within seven days of the verdict. See Fed. R. Civ. Pro. 33.

eventually would have told the truth." (Def. Reply Br. at 34). However, defendants have failed to meet the predicate requirement for granting a new trial under Rule 33. "When the newly discovered evidence focuses on the perjury of a witness, a threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." United States v. White, 972 F.2d 16, 20 (2d Cir. 1992).

As described herein, Brown's subsequent testimony does not adequately demonstrate that he committed knowing perjury during the Rigases' trial. See Dunnigan, 507 U.S. at 94 ("A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory").

B. Testimony from Other Witnesses

Defendants argue that, despite their diligence, the witness' refusal to cooperate rendered them unavailable before trial. However, the steps that defense counsel took to obtain these witnesses' testimony were insufficient. Courts have denied Rule 33 motions where the defendant "has produced no evidence of any attempts to subpoena either co-defendant before or during trial," see United States v. Cruz, 602 F. Supp. 825, 833 (S.D.N.Y. 1985), or "to request that the government grant them immunity." United States v. Matos, 781 F. Supp. 273, 279-280 (S.D.N.Y. 1991). Although defense counsel attempted to communicate with these witnesses voluntarily, neither of these steps was taken.

Similarly, defendants claim that the government's Bill of Particulars and a memorandum from Adelphia's legal department both had a "chilling effect" and precluded defense counsel from obtaining statements from a number of witnesses.

Again, defense counsel does not allege that these witnesses would have defied a federal subpoena had they been called to testify at trial. Tellingly, one witness even told defense counsel that he would not "say anything without a subpoena." (Def. Mot. at 46). Defendants' choice not to pursue this testimony was a strategic decision, and cannot now form the basis for a new trial.[2]

Defendants contend that counsel could not have been required to subpoena all possible witnesses, or to "call all of those individuals to the stand without any indication of what they would say or whether they had any relevant information at all." (Def. Br. at 43). However, this argument has been squarely rejected by prior courts. See Matos, 781 F. Supp. at 279-280 ("The precise testimony of any potential witness cannot be known until it is had … The decision not to interview [a witness], and not to call [a] witness, whether wise or not, was a deliberate and strategic one. The defendant is not entitled to a new trial so that he may employ a different strategy.") (citing United States v. Beasley, 582 F.2d 337, 339 (5th Cir. 1978)). Defendants concede that the decision not to call these witnesses was a conscious and deliberate decision, "discussed among counsel and with at least Tim and John Rigas." (Flemming Aff. at 8). Because the testimony that defendants cite could have been available if defendants had subpoenaed these witnesses at the time of trial, there is no newly discovered evidence within the meaning of Rule 33.

---

[2] The Second Circuit recently addressed whether testimony by an alleged co-conspirator, who refused to testify pursuant to his fifth amendment privilege against self-incrimination, could be considered "newly discovered" if the co-conspirator's testimony was made available after the trial. The Court joined the majority of circuits to consider this issue, and held that a new trial could not be ordered "on the basis of evidence that was known by the defendant prior to trial, but became newly available after trial." United States v. Owen, 500 F.3d 83, 89 (2d Cir. 2007). Accordingly, "Rule 33 does not authorize district courts to grant new trials on the basis of such evidence since it is not newly discovered, but merely newly available." Id. Evidence of testimony from witnesses who were identified as potential trial witnesses by the government is newly available, not newly discovered.

## IV. Impact on Verdict

We conclude that in the context of the entire trial and considering the challenged testimony in its entirety, rather than as isolated and inapposite comparisons of Brown's testimony at trial with subsequent testimony as to different and more specific questions, the jury's verdict would not have been different had it considered the allegedly conflicting testimony.

## IV. Conclusion

For the reasons stated above, defendants' motion for a new trial is DENIED.

SO ORDERED.

Dated:   New York, New York

November 20, 2007

_____
U.S.D.J.