

DIRECT DIAL NUMBER:  
(215) 575-7268

Lawrence G. McMichael  
lmcmichael@dilworthlaw.com

*With counsel:* Lawrence C. Marshall  
**STANFORD LAW SCHOOL**  
559 Nathan Abbot Way  
Stanford, CA 94305  
DIRECT DIAL NUMBER:  
(650) 723-7572

November 20, 2013

The Honorable Kimba M. Wood  
United States District Judge  
United States District Court, Southern District of New York  
1610 United States Courthouse  
500 Pearl Street  
New York, NY  10007

      RE:    *Rigas v. United States*, 11 Civ. 6964 (KMW) & 02 Cr. 1236 (KMW)

Dear Judge Wood:

      Pursuant to this Court's October 31, 2013 Order, we write to apprise the Court of the status of the matters now pending before the Court. We also wish to provide the Court with some context regarding the case and new developments that bolster the need for discovery, an evidentiary hearing, and Section 2255 relief. Because of the unusual history of this Section 2255 proceeding—in which the case has been reassigned on several occasions and there has been a significant period in which it has been dormant—this letter seeks to provide the Court with a synopsis of the claims being made and developments that are relevant to the Motions currently pending.

      On October 4, 2011, John and Timothy Rigas each filed a timely Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct his Sentence ("Section 2255 Motions"). These motions relate to defendants' heavily contested convictions in 2004 for various bank fraud, securities fraud and conspiracy offenses involving Adelphia Communications Corporation. Defendant John Rigas, who is presently 89 years of age, is now serving the seventh year of his 12-year sentence. His son, Timothy Rigas, who is 57 years of age, is serving the seventh year of his 17-year sentence.

      In tandem with the motion for relief under 28 U.S.C. § 2255, defendants also filed a Motion for Discovery under Rule 6(a) of the Rules Governing Section 2255 Proceedings ("Discovery Motion"). This Motion specified the discovery sought and requested an evidentiary

hearing on the claims advanced. In addition, the Rigases have requested the opportunity to present oral argument in support of the Motions that have been filed.

The United States thereafter filed a Memorandum of Law in Opposition to the Motions on February 22, 2012, and the Rigases filed a Reply Memorandum in Support of the Motions on July 9, 2012. Judge Sand had not ruled upon any of the motions at the time the case was transferred in November 2012. From that time until August 2013, there was some uncertainty about whether the case was being handled by Your Honor or by Chief Judge Preska (this uncertainty may have been occasioned by the fact that the § 2255 case was assigned a new civil case number, but is also linked to the original criminal case number). On August 15, 2013, a Notice of Case Reassignment indicated that Your Honor will be handling the case.

The earlier Motions and Memoranda were drafted with the assumption that Judge Sand would be considering them. Because he presided at the trial and various post-trial proceedings, our filings did not provide as much background as they would have had we known the case would be before another judge. Should this Court believe it would benefit from an additional filing that provides more of that background and context, we would be pleased to submit such a document. In the meantime, though, we will provide a relatively brief overview of the issues and highlight several new developments that we wish to bring to the Court's attention—developments that bolster the need for discovery and relief. These developments relate to both of the two basic issues advanced in the Section 2255 Motions. To explain them, we will first provide a summary of the claims to which they relate.

*1. The* Brady *Claim*

The Section 2255 Motions contend that the prosecution violated the defendants' rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose materially exculpatory information the prosecution learned in a pre-trial interview with Carl Rothenberger (the lead securities lawyer for the transactions at issue). Mr. Rothenberger had been intimately involved in virtually all of the transactions and disclosures at issue in the case, and the defendants (who are not lawyers) had always maintained they relied on him completely in ensuring that all disclosures and transactions were in full compliance of the relevant law and regulations. In addition, Mr. Rothenberger often worked directly with many other Adelphia employees on these regulatory issues—with neither of the defendants being in that loop at all.

Once the Government investigation began, Mr. Rothenberger refused to speak with the Rigases or their lawyers, so the Rigases were at the mercy of the Government's disclosures to learn whether Mr. Rothenberger was remaining faithful to what the Rigases knew was true—that Mr. Rothenberger and lawyers from his firm working under his supervision were advising the Rigases every step of the way on how to comply with the law, that the Rigases never withheld any material information from him, and that Mr. Rothenberger relied on several other Adelphia employees for information relating to various disclosures.

The only information the Government provided the defense before trial about Mr. Rothenberger, however, was a two-sentence letter indicating that Mr. Rothenberger may be able to provide exculpatory evidence about an exceedingly minor part of the case (involving a

transaction for timber rights). This disclosure understandably led the defense to conclude that Mr. Rothenberger was refusing to acknowledge that he had advised the Rigases on the key securities transactions and filings in question, and how the Rigases were not even personally involved in many of the disclosure decisions. Accordingly, the defense never called Mr. Rothenberger. The Government also did not call Mr. Rothenberger. Remarkably, therefore, even though he was the most central player across the array of issues relevant to the trial, the jury never heard from him.

A year after trial, in 2005, the defense learned through a civil deposition that Mr. Rothenberger had discussed many of the key subjects with the Government in a pre-trial interview. The defense later learned, in 2007, that the Government actually had notes of that interview, which were not turned over to the defense. Over the ensuing two years, the defense fought to secure access to these notes, but the Government prevailed in keeping them secret based on its vehement, repeated assurances to Judge Sand and the Second Circuit that it had no duty to turn over the notes (even to the Court for *in camera* review) because there was nothing the least bit exculpatory about them.

Eventually, in 2011, the defense secured the notes when the United States District Court for the Middle District of Pennsylvania ordered the Government to turn them over as potential *Brady* material in a tax case pending there against the Rigases. The tax case turned on many of the same key facts as this one, and the exculpatory power of the notes applied to both prosecutions. Shortly after the notes were disclosed, the prosecution dropped the tax charges it had been pursuing against the Rigases for close to a decade.

As explained in the Motions and accompanying Memoranda, disclosure of the notes was a critical moment in the history of this case. The notes exposed the plain falsehood of the Government's claims to the courts that they contained nothing exculpatory. Rather, the Rigases maintain that the notes most certainly contain significant exculpatory information about every major issue in the case, and the Government had a clear duty under *Brady* to turn the notes over before trial and to disclose all other exculpatory statements Mr. Rothenberger made that were not reduced to paper.

In its response to the *Brady* claim here, the Government argues, among other things, that the notes are not clearly exculpatory. One of the Government's claims is particularly important. The notes state that Mr. Rothenberger told the prosecutors that the person he worked with in deciding how to disclose related party transactions was an Adelphia employee named Doug Malone. The notes state that Mr. Rothenberger asked Mr. Malone whether there were other transactions that needed to be included. According to these notes, the Rigases had nothing to do with Mr. Rothenberger's decisions about how to properly disclose the transactions.

Nonetheless, the Government now argues that the information was not exculpatory because the Government believes that Mr. Malone never told Mr. Rothenberger all the relevant facts and that he must have withheld those facts as part of some conspiracy with the Rigases. Gov. Opp. at 32. The Government takes the position that it was legitimate to withhold the notes for that reason, even though Mr. Malone was never found to be a co-conspirator of any sort. Indeed, in August 2002 Mr. Malone entered into a non-prosecution agreement with the

Government pursuant to which he agreed to tell the Government the entire truth regarding his actions at Adelphia. His accounts were turned over to the defense as 3500 materials. Yet not a word in those "truthful" accounts suggests that Mr. Malone conspired with the Rigases to hide vital information about related party transactions from Mr. Rothenberger.

The remarkable position that the Government is now advancing (*i.e.,* that the Government's subjective beliefs about the veracity of information exempts it from *Brady*'s requirements) raises grave concerns about whether this same reasoning explains the many other apparent gaps in the disclosures. Since the time of trial, there are several key players with deep knowledge of the relevant facts whom (a) the Government interviewed prior to trial; (b) the Government never called as witnesses; yet (c) about whom the Government never disclosed any *Brady* material. (As discussed below, the Government took steps directly and through Adelphia to prevent these individuals from speaking with the defense so that the defense did not call them as witnesses either.) The Government relied heavily on just one witness, James Brown, to make its case, and there can be no doubt that it would have eagerly embraced any other witnesses who could corroborate Mr. Brown's account or provide information on aspects of the case outside of the subjects in which Mr. Brown was involved. For example, the recently disclosed notes of the Rothenberger interview indicate that Mr. Rothenberger worked with Tim Werth (an Adelphia accountant who later pled guilty to fraud charges) in formulating the proper approach for the 10-K disclosures of Adelphia's contingent debt. Yet, the process through which the two of them formulated the disclosure language (language that was a primary part of the basis for the prosecution and convictions of the Rigases) remains a "black box," given that neither Mr. Rothenberger nor Mr. Werth were called by the Government and no *Brady* disclosures were ever made on this topic. The Government obviously had a reason for not calling these witnesses, and there is a reasonable inference that the reason was because they were telling the Government information that was exculpatory of the Rigases. Yet, no *Brady* disclosures were made. These are among the various issues on which the Rigases seek to conduct discovery in support of their *Brady* claim.

With regard to the Motions for Discovery, there has been a very significant development that we brought to the Court's attention in an April 23, 2013 letter. It came to light earlier this year that there are *two additional sets of notes* from Mr. Rothenberger's critical pre-trial interview with the prosecution. J. Alan Johnson, who attended the interview as counsel for Mr. Rothenberger's law firm, Buchanan Ingersoll, took one set of notes. Patrick McLaughlin, who attended as counsel for Mr. Rothenberger, took the other set of notes. The information that these notes exist was provided by the Buchanan Ingersoll firm to one of the Rigases' undersigned counsel, Lawrence McMichael. But the firm will not tender the notes in the absence of a subpoena. The notes appear to be verbatim or near-verbatim accounts of the interview (and under the circumstances of this case are clearly not immune from discovery under the work product doctrine). These notes are highly relevant to determining the actual contents of the interview session in question. Part of the Government's opposition to the Rigases' *Brady* claim is that the notes are somehow ambiguous on various points. The Rigases disagree with that characterization. But the additional notes would almost certainly shed additional light on exactly what Mr. Rothenberger said that day (and, of course, the duty under *Brady* is to disclose what was said, not only what was reduced to the Government's notes). The newly discovered

y

existence of these notes provides yet further powerful justification for granting the pending Motion for Discovery. And, quite aside from these notes, the troubling questions about the adequacy of the Government's compliance with *Brady* justifies discovery from those attending the meeting about what Mr. Rothenberg actually said that day.

     2. *The Government Interference Claim*

The second claim advanced in Section 2255 Motions is that the Government violated the Rigases' constitutional rights by aggressively interfering with the defense function prior to trial, using tactics similar to (and in many ways, more aggressive than) those deemed unconstitutional in *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008). The Government's actions here came during an era in which use of the Holder Memorandum—which has now been scaled back significantly because it was deemed to have unacceptably allowed the prosecution to cripple the defense in many cases—was at its apex. Directors were made to understand that the corporation and the directors themselves were at peril of being indicted unless they could satisfy the Government that they were aiding the prosecution of selected individuals.

The Motions and Memoranda present extensive evidence (most of which came to light only after the criminal trial) about the extent to which the prosecutors used the threat of indictments to force Adelphia to become the Government's foot soldier in the war against the Rigases. As one of the independent outside directors later testified in a civil deposition, Adelphia's attorneys "had been co-opted by the Government." The strategy of giving the prosecutors control of Adelphia's decisions regarding fee-advancement and control of defense access to witnesses and evidence was the centerpiece of Adelphia's efforts to survive. Indeed, Adelphia's lawyers would later plead with the Government to spare Adelphia because it had provided "extraordinary cooperation" and had sought Government approval of various decisions based on the Government's "insistence that no less is acceptable." The company boasted that it had "taken as its mandate the duty to provide complete and unqualified assistance to the Government." *See* Mem. in Support of Section 2255 Relief at 42. The strategy worked. Neither Adelphia nor any of the non-Rigas directors who oversaw it were ever indicted.

The Section 2255 Motions and Memoranda explain that the Rigases were severely damaged by the actions the Government took *via* Adelphia. As in *Stein*, the Government used its power to coerce Adelphia's new board of directors to withdraw fee-advancement and indemnification to which the Rigases were entitled and which the board had previously agreed to provide. This same pressure caused Adelphia to terminate the Joint Defense Agreement it had only shortly before entered into with the Rigases and other individuals. In addition, Adelphia, working in coordination with the Government, held the advancement of legal fees over the heads of numerous employees (including some who later testified against the Rigases) to leave them no choice but to tell the story that the Government demanded. According to the June 6, 2002 agreements, these employees were required "to promptly repay all advances of legal fees paid by the Company to you if the Company determines in its sole discretion that you have ceased to perform your obligations under clause (1) of this paragraph," which included the obligation to cooperate with the Government.

Of all the ways in which the Government interfered with the defense, none was more significant than how the Government used threats of indictments (often called the "corporate death penalty") to compel the Adelphia board to prevent various key witnesses from speaking with the defense. This action was done in several stages. In July 2002, those very same Adelphia lawyers who had been identified as having been "co-opted by the Government," worked hand in hand with the Government—and secured the Government's approval—before entering agreements under which seven Adelphia employees would be placed on *paid* administrative leave. These individuals included many of the Adelphia employees who had worked most closely on the relevant transactions and disclosures and who, therefore, were the most critical for the defense. Yet, the administrative-leave-agreements explicitly conditioned their continued pay on their agreeing to cooperate with the prosecution, and *on their not sharing any information with others, including the defense.*

These decisions were made in close coordination with the Government. Before the agreements were tendered to the employees, Adelphia's lawyers asked the chief prosecutor in the case, "Does this do the trick?" The Assistant United States Attorney responded that it did, provided that Adelphia also agreed not to interview witnesses the Government identified as off limits. *See* Def. Mem. at 41. These agreements were later followed up with a broad directive from Adelphia's General Counsel to all personnel, describing the company's cooperation with the Government and stating that as part of that cooperation, "I have been asked to direct everyone" to refrain from speaking with the Rigases or their representatives. *Id.* Along these same lines, when a Deloitte & Touche auditor sought to speak with some of the individuals who had been placed on administrative leave, Adelphia management told him that any such interviews could only be conducted with Government approval. Coulter 7/1/02 SEC Testimony, Gov. Ex 3550B, at 183-184.

Indeed, there was even more evidence of the Government taking direct action to keep potential defense witnesses away from the defense. James Brown was the former Adelphia employee who, after being indicted with the Rigases, negotiated a plea agreement and became the Government's star witness. During his cross-examination at trial, he admitted that as part of his plea agreement he "was asked not to talk with other witnesses," which he acknowledged would, of course, include the defendants. Tr. 7675. Similarly, Dean Marshall, who had served in the Corporate Finance Department at Adelphia, later testified that he had been told that the Government did not want him talking to the defense. And a May 2002 Report from Covington & Burling to the Special Committee of Adelphia's Board of Directors indicated that numerous witnesses, "including those most likely to have knowledge directly relevant to the matters at issue, have <u>not</u> been available" for interviews, in some cases "under the instruction of the U.S. Attorney's office." DT00858658. (Emphasis in original) Other minutes of the Board of Directors meeting further show that the Government was micromanaging which witnesses could talk to whom and which could not talk at all. May 15, 2002, A-RA 015367.

The Section 2255 Motions explain that these threats and enticements forced many critical defense witnesses to refuse defense efforts for interviews and information. For example, we now know from the notes of the prosecution's interview with Mr. Rothenberger that Doug Malone was the person upon whom Mr. Rothenberger relied in approving the reporting of related party transactions. Clearly, neither Mr. Rothenberger's nor Mr. Malone's account was helpful to the

Government—as neither was called as a witness by the prosecution. Ordinarily, one would have expected the defense to call such a witness. The defense was never able to get pre-trial access to Mr. Malone because of the wall the Government had erected around him. Adelphia's payments and threats rendered him unable to tell the defense his version of what happened without losing his salary, having to repay any fees advanced to date, losing any chance for future fee advancement, and otherwise imperiling himself. (There is similar evidence that Mr. Rothenberger refused to be interviewed by the defense because of fears the Government instilled in him about how any cooperation with the defense would be taken into account in the prosecutors' decision whether to bring charges against him.)

So, as a result of these tactics, the jury charged with determining whether John or Timothy Rigas acted criminally with regard to disclosure of these transactions, never heard from either the key figure who supplied the information (Mr. Malone) or the key figure who crafted those disclosures, and the jury was thus forced to try to ascertain the facts surrounding various decisions without evidence about what actually went into making them and what role, if any, the Rigases played in the process. And because some of the individuals, at the Government's behest, refused to provide the defense with truthful information were the individuals who worked most closely with James Brown (the Government's star witness), Mr. Brown was able to testify to all sorts of dubious facts without any fear of being impeached or contradicted by his former co-workers. This interference with defense access to witnesses had a material and prejudicial impact on the trial. The adversarial system cannot function when one of the parties is able to keep the other from speaking with the witnesses who would prove its case.

This interference, the Motions allege, also directly led co-defendant James Brown to give up on presenting any defense and to instead cut a deal with the Government in return for his becoming the star witness against the Rigases. The Motions provided an affidavit from Tim Rigas describing how Mr. Brown reported that, despite his innocence, Adelphia's withdrawal of fee–advancement left him without funds with which to defend himself and gave him no choice but to plead guilty and cooperate with the Government. In response to this claim, the Government asserted in its opposition brief that one reason the Court should reject this assertion is that "this claim is based on nothing more than Timothy Rigas's self-serving affidavit, which can be given no weight in light of the massive fraud that he perpetrated." Gov. Opp. at 59. Since the time that the Government wrote those words, another person has spoken to this issue. This person is one to whose words the Government decidedly wants the Court to credit: James Brown.

Last year, Mr. Brown was a defendant in a civil action in Potter County, Pennsylvania. (*Rigas v. Brown*, No. 2006-305) The action involved the Rigases' claim that Mr. Brown failed to repay a loan. In the course of his testimony in that case, Mr. Brown described the dire straits in which he found himself once he learned that Adelphia was withdrawing its legal obligation of fee-advancement and indemnification. These actions caused Mr. Brown to be distraught and frantic about being unable to defend the case from a financial standpoint. N.T. 174. He knew the very limited funds at his disposal were woefully inadequate for any kind of defense in a lengthy trial. N.T. 173. (Indeed, his limited funds were nearly exhausted just by negotiations and proceedings leading to his guilty plea.) Mr. Brown testified that he did not think a Public Defender would be up to the task of representing him and also did not think he would necessarily be eligible for a public defender. N.T. 185-86. Meanwhile, Mr. Brown's lawyer, Howard Heiss,

was getting nervous about not being paid. N.T. 139.  Additional evidence will show that Mr. Brown acknowledged that he feared mightily that a conviction (which he could not prevent absent access to funds) would take him away from his family. Thus, despite the fact that he had always proclaimed his innocence, once it was clear that he would have no funds defend himself, Mr. Brown approached the Government and offered to plead guilty and become the prosecution's star witness. Mr. Brown acknowledged all this, but claimed that he decided to pursue a deal with the Government only once he saw the thoroughness of the indictment. This explanation was impeached by his own lawyers' billing records which show that plea negotiations with the Government had been going on for close to two months before the indictment was even issued.

The evidence made clear, then, that it was the withdrawal of the fee-advancement and indemnification that forced Mr. Brown into abandoning his defense and testifying against the Rigases. This evidence strongly corroborates the claims put forth in the Rigases' Section 2255 Motions—claims that the Government has argued were supported by Timothy Rigas's account alone. The evidence supports the claim that the withdrawal of fee advancement to Mr. Brown rendered him desperate to find some way to escape what he deemed to be a sure conviction and that he seized that escape route by testifying falsely against the Rigases on scores of material issues. In addition, even though he began negotiating with, and actively providing information to the Government, in August 2002, Mr. Brown remained part of the Joint Defense Agreement—learning all kinds of information about the strategies and defenses—for another three months, until withdrawing on November 13, 2002.

Finally, on the subject of James Brown, during the civil trial Mr. Brown testified that he had still not been sentenced, now 11 years after his 2002 guilty plea to multiple felonies. He explained that he has never served a day in jail and, tellingly, that he hopes he will never have to serve any time at all. N.T. 196-97. This more than a decade-long delay in the initiation of sentencing proceedings is remarkable and constitutes a massive benefit to Mr. Brown, who had earlier expressed great concern about not having to miss watching his children grow up while he was in prison. The reality of this indefinite stay of sentencing stands in stark contrast to what Mr. Brown told the jury at the Rigases' criminal trial: that all he expected from the Government was a letter indicating his cooperation. Surely, no juror would ever have imagined that more than a decade after he pleaded guilty, Mr. Brown would still remain free without the Government having even sought to commence sentencing proceedings. (The same is true of Tim Werth, another defendant who pleaded guilty and cooperated against the Rigases, but has still never been sentenced.) This extraordinary benefit that has been afforded to the Government's indisputably star witness casts an enormous pall on the entire case that ought not, and cannot, be ignored.

We hope this provides the Court with some factual context for where the case now stands. As mentioned, we are eager to do anything we can to provide further information and to expedite the Court's consideration of these issues.

Respectfully,

      /s/ Lawrence G. McMichael    /s/ Lawrence C. Marshall (with consent)
         Lawrence G. McMichael        Lawrence C. Marshall

cc:    David B. Massey (via e-mail)
       Justina L. Geraci (via e-mail)