UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

JOHN J. RIGAS and TIMOTHY J. RIGAS,

       Petitioners,

   -against-

UNITED STATES OF AMERICA,

       Respondent.

-------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 15, 2020
```

11-CV-6964 (KMW)

02-CR-1236 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

 John Rigas and Timothy Rigas (the "Rigases") were tried and convicted on fraud charges arising from their conduct as executives of Adelphia Communications Corporation ("Adelphia"), a publicly traded cable company.  They now move for judgment on their claims under 28 U.S.C. § 2255 alleging (1) violations of *Brady v. Maryland*, 373 U.S. 83 (1963) (the "*Brady* Claims"), and (2) constitutional violations resulting from the Government's alleged interference with their defense at trial (the "Interference Claims").  (ECF Nos. 123, 163, 191.)  For the following reasons, their motions for judgment are DENIED, and their § 2255 petition is DISMISSED.

**BACKGROUND**

**I.  General Background**

 Adelphia was founded by John Rigas in 1952 in Coudersport, Pennsylvania.  By the 1980s, Adelphia was a publicly traded company that was one of the nation's largest providers of cable television.  John Rigas was Adelphia's President, Chairman of the Board of Directors, and Chief Executive Officer.  His son, Timothy Rigas, was Executive Vice President, Chief Financial Officer, and a member of the Board of Directors.  *United States v. Rigas*, 490 F.3d 208, 212 (2d Cir. 2007).

On March 27, 2002, Adelphia disclosed that it had $2.2 billion of previously undisclosed liabilities on its balance sheet.  These liabilities resulted from the Rigases having concealed the extent of the debt for which Adelphia was jointly liable, as "co-borrower," with certain Rigas-owned companies (the "Rigas Managed Entities" or "RMEs").  When Adelphia disclosed this liability, Adelphia's stock price plummeted.  In June 2002, the company filed for bankruptcy. *See id.*

In September 2002, the Rigases were indicted in the Southern District of New York on charges of securities fraud, wire fraud, bank fraud, and conspiracy.  Judge Leonard Sand presided over their trial.  The Government argued to the jury that the Rigases engaged in a series of fraudulent, improperly disclosed transactions designed to conceal Adelphia's debts and to enrich the Rigases at Adelphia's expense.  The Rigases were convicted of securities fraud, bank fraud, and several counts of conspiracy, but were acquitted of wire fraud and the associated conspiracy charges.  *See id.* at 211, 214–19.

## II.     Background of the *Brady* Claims

In their *Brady* Claims, the Rigases claim the Government failed to disclose exculpatory statements made by certain individuals during pretrial interviews.  The claims relate to (1) Carl Rothenberger, a lawyer at Buchanan Ingersoll, who was the Rigases' securities lawyer, and (2) several employees of Scientific Atlanta and Motorola, both of which companies were alleged to have engaged in fraudulent transactions with Adelphia.  A brief summary of the relevant facts and procedural history follows.

### a.   The Government's Pretrial Disclosures

The Government made the following pretrial disclosure about Rothenberger, the Rigases' securities lawyer, in a February 24, 2004 letter: "The Government writes to inform you that Carl

2

Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars." (Petitioners' Amended Rule 56.1 Statement of Material Facts ("*Brady* 56.1") ¶ 8, ECF No. 163.) The reference to a "timber rights transaction" concerned Adelphia's alleged failure to report its acquisition of certain timber rights from John Rigas—a minor component of the Government's case. (*Id.* ¶ 9.) The Government made no other disclosure regarding Rothenberger. Rothenberger refused the Rigases' attempts to interview him in advance of trial. (*Id.* ¶ 5.)

The Government made no pretrial disclosure regarding any Scientific Atlanta or Motorola employees. (*Id.* ¶ 309.)

Neither party called Rothenberger or any Scientific Atlanta or Motorola employee as a witness at trial. (*Id.* ¶¶ 13, 219.)

b. <u>The Motion to Compel Discovery</u>

On December 6, 2007, shortly after Judge Sand denied their motion for a new trial, the Rigases moved to compel the Government to produce the notes of its pretrial interviews of several witnesses who did not testify at trial, including Rothenberger and several employees of Scientific Atlanta and Motorola (the "Motion to Compel"). The Rigases claimed that, in civil proceedings subsequent to the Rigases' trial, these witnesses gave testimony that the Rigases believed would have exculpated them in their criminal trial. The Rigases argued that it was likely that any notes from the Government's pretrial interviews with these witnesses would contain exculpatory information. Thus, the Government would have a *Brady* obligation to disclose the notes. (*Id.* ¶¶ 31–33; *id.* Ex. 9.)

Judge Sand denied the Motion to Compel. *See United States v. Rigas*, 02-CR-1236, 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008). Judge Sand reasoned that the Rigases "knew of

Rothenberger's existence, his role at Adelphia, and the facts on which he could [give] testimony," and thus they had the "essential facts" necessary to take advantage of the information contained in the notes.  *Id.* at *2.  Judge Sand likewise reasoned that the Rigases were aware of the identities of the Scientific Atlanta and Motorola employees and their involvement in the transactions that were discussed at trial.  *See id.*  Judge Sand concluded that, because the Rigases could have obtained these witnesses' testimony by subpoena, their statements to the Government were not *Brady* material.  *See id.*

The Rigases appealed Judge Sand's denial of the Motion to Compel.  The Second Circuit affirmed, finding that there was "no error" in Judge Sand's ruling.  *United States v. Rigas*, 583 F.3d 108, 126 (2d Cir. 2009), *cert. denied*, 131 S. Ct. 140 (2010).

### III.    Background of the Interference Claims

In their Interference Claims, the Rigases claim the Government interfered in their defense at trial by restricting their access to (1) counsel and (2) witnesses, based on a series of actions taken by Adelphia and its former counsel, Buchanan Ingersoll, during the Government's investigation of the Rigases.  These events are summarized below.

#### a.  Adelphia's "Special Committee"

Adelphia's response to the Government's investigation of the Rigases was managed by the Special Committee of Adelphia's Board of Directors (respectively, the "Special Committee" and the "Board").  (Petitioners' Rule 56.1 Statement of Material Facts in Support of Their Motion for Judgment on the Interference Claims ("Interference 56.1") ¶ 52, ECF No. 193.)  The Board appointed the Special Committee shortly before Adelphia disclosed its co-borrowed debt, to advise the Board about Adelphia's transactions with one of the RMEs.  (*Id.*)  The Special Committee was composed of independent directors who were not part of the Rigas family.  (*Id.*

4

Ex. 93 at 3.)  When Adelphia disclosed its co-borrowed debt, the Board expanded the Special

Committee's mandate to include investigating the accounting and disclosure issues between

Adelphia, the Rigas family, and all of the RMEs.  (*Id.*)

    b.  Access to Counsel: Adelphia's Refusal to Advance the Rigases' Legal Fees

In mid-May 2002, the Special Committee and its outside counsel asked the Rigases to

resign from their positions as officers of Adelphia.  (Interference 56.1 ¶ 46.)  The Rigases

complied but were permitted to remain on the Board.  (*Id.* ¶¶ 47–50).

At a May 16, 2002 Board meeting, Adelphia's outside counsel reported to the Board that

the Department of Justice ("DOJ") believed that Adelphia was not cooperating sufficiently with

its investigation of the Rigases.  (*Id.* ¶ 54.)

On May 23, 2002, the Rigases agreed to resign from the Board, pursuant to a written

agreement ("May 23 Agreement").  (*Id.* ¶ 75.)  The May 23 Agreement stated that Adelphia

would indemnify the Rigases "according to the Bylaws and Delaware law" as long as Rigases

"undertake to repay Adelphia per the Bylaws."  (*Id.* ¶ 81.)  Adelphia's bylaws ("Bylaws")

provided for indemnification for Adelphia's officers and directors "[e]xcept to the extent

prohibited by law."  (*Id.* ¶ 82.)  The Bylaws also provided that Adelphia would advance the legal

expenses and fees of indemnified officers and directors, if the officer or director "shall undertake

to repay such amounts advanced to the extent that a court of competent jurisdiction ultimately

determines that such a person is not entitled to indemnification . . . unless the Board of Directors

or independent legal counsel reasonably determines that such person deliberately breached his

duty to the Corporation or its shareholders."  (*Id.* ¶ 83.)

On the same day they resigned from the Board, the Rigases wrote to Adelphia, asking the

company to advance their legal fees.  (*Id.* ¶ 84.)  At a June 1, 2002 meeting, the Board denied

the Rigases' request that Adelphia advance their legal fees.  The Board found that the Rigases

were not entitled to have their legal fees advanced because they had breached their duties to

Adelphia and its shareholders by failing to cooperate with the Special Committee's investigation,

and because they participated in conflict transactions with Adelphia, for their own benefit,

without appropriate disclosures and Board approval.  (*Id.* ¶ 102.)

    c.   Access to Witnesses: the Refusal of Adelphia and Buchanan Ingersoll Employees to Speak to the Rigases

On October 14, 2002, Adelphia issued a memorandum to its employees, instructing them

not to speak to the Rigases about business matters, and to refer all contacts with the Rigases to

Adelphia's legal department.  The memorandum stated that Adelphia was cooperating with the

Government's investigation of corporate wrongdoing.  (*Id.* ¶¶ 154–64.)  The parties refer to this

memorandum, which was written by Adelphia's general counsel, Randal Fisher, as the "Fisher

Memorandum."  Many Adelphia employees refused the Rigases' attempts to interview them

prior to trial.  (*Id.* ¶¶ 165–78.)

The Rigases attempted to interview their former lawyers from Buchanan Ingersoll prior

to trial, but the latter refused to speak to them.  (*Id.* ¶ 200.)

At trial, the Rigases did not call any witnesses from Adelphia or Buchanan Ingersoll.

Timothy Rigas did not call any witnesses.  John Rigas called a character witness and two lawyers

from Covington & Burling ("Covington"), whose testimony was used to impeach a Government

witness on a minor point of his testimony.  *See Rigas*, 490 F.3d at 219.

## IV.    Discovery and Procedural History of the Instant Petition

On October 4, 2011, the Rigases filed a petition for a writ of habeas corpus under 28

U.S.C. § 2255.  (ECF No. 1.)  The § 2255 petition sets out two grounds for relief: the *Brady*

Claims and the Interference Claims.  The Rigases now seek judgment on both grounds.

     a.  The *Brady* Claims

Through discovery in this and other matters, the Rigases have now obtained the materials

they claim the Government should have disclosed under *Brady*.

On June 6, 2011, the Rigases obtained, through discovery in a criminal tax case in the

Middle District of Pennsylvania, the notes taken by Postal Inspector Thomas Feeney during

Rothenberger's pretrial interview (the "Feeney Notes").  *See United States v. Rigas*, 779 F. Supp.

2d 408 (M.D. Pa. 2011) (Jones, J.).  (*Brady* 56.1 ¶¶ 49–54.)

Subsequently, this Court ordered Rothenberger's law firm, Buchanan Ingersoll, to

produce any notes taken by Buchanan Ingersoll lawyers who were present at Rothenberger's

pretrial interview.  (*Brady* 56.1 ¶ 56.)  Buchanan Ingersoll produced several sets of notes and

memoranda in response to this request.  (*Id.* ¶¶ 57–60.)

This Court also ordered the Government to disclose its notes of any pretrial interviews of

Scientific Atlanta and Motorola personnel.  (*Id.* ¶ 239.)  The Government disclosed several

memoranda memorializing its pretrial interviews of six Scientific Atlanta employees and two

Motorola employees, all conducted between July 2002 and January 2003 (together, the

"Scientific Atlanta and Motorola Notes").  (*Id.* ¶¶ 240–48.)

The Rigases sought judgment on the *Brady* Claims on April 28, 2017.  (ECF No. 123.)

This Court denied their motion because it did not comply with Local Rule 56.1 and the Court's

Individual Practices.  (ECF No. 150.)  On February 7, 2018, the Rigases filed an amended

motion for judgment on the *Brady* Claims and an amended Rule 56.1 Statement.  (ECF No. 163.)

     b.  The Interference Claims

On August 20, 2014, the Court stayed discovery on the Interference Claims so that the

Government could pursue its objection that the Interference Claims were procedurally barred because they were never raised prior to the instant § 2255 proceedings.  (ECF No. 47.)  The Court held that the Rigases had "cause" for failing to raise the Interference Claims during trial because, during trial, the Rigases were not aware of any facts that would put them on notice that the Government was interfering in their defense.  The Court permitted discovery to enable the Rigases to obtain evidence of the Government's allegedly improper conduct.  *See Rigas v. United States*, 11-CV-6964, 2015 WL 3403861, at *12 (S.D.N.Y. May 15, 2015).

On May 25, 2018, the Rigases moved for judgment on the Interference Claims.  (ECF No. 191.)

### LEGAL STANDARD[1]

A petition under 28 U.S.C. § 2255 must be granted if the petitioner establishes "that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a). Relief is available under § 2255 "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which results in a complete miscarriage of justice.'"  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

The Court must hold an evidentiary hearing on a § 2255 petition "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28

---

[1] On February 19, 2016, this Court modified John Rigas' sentence to time served, due to his failing health.  (ECF No. 104.)  Since John Rigas is no longer in custody, his claims are considered as a petition for a writ of *coram nobis*.  "[C]oram nobis is an extraordinary remedy which operates under rules that are generally more stringent than those applicable to habeas."  *Kaminski v. United States*, 339 F.3d 84, 90 (2d Cir. 2003).  If John Rigas cannot show error entitling him to relief under § 2255, then he is not entitled to a writ of *coram nobis*.

U.S.C. § 2255(b).  A petition lacking evidentiary support does not warrant a hearing, and the

Second Circuit has cautioned that "[a]iry generalities, conclusory assertions and hearsay

statements will not suffice."  *Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007)

(quoting *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987)).  "It is within the district

court's discretion to determine whether a hearing is warranted."  *Pham v. United States*, 317 F.3d

178, 184 (2d Cir. 2003).

## DISCUSION

### I.    The *Brady* Claims

The Rigases claim they are entitled to relief under *Brady* because the Government failed

to disclose (1) the Feeney Notes and (2) the Scientific Atlanta and Motorola Notes.[2]  Under

*Brady*, the Government must disclose evidence to the defendant when the evidence is "material"

to guilt or punishment.  *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001).

The *Brady* Claims fail under each of three separate doctrines.  First, the *Brady* Claims fail

under the law of the case doctrine, which bars parties from relitigating issues decided at an

earlier stage of litigation.  Second, the *Brady* Claims fail on their merits under the essential facts

doctrine, which provides that the Government has no *Brady* obligation to disclose a witness'

exculpatory statements if the defendant knows enough about the witness to take advantage of the

witness' exculpatory testimony.  Third, the *Brady* Claims fail under *Brady* itself, because neither

the Feeney Notes nor the Scientific Atlanta and Motorola Notes contain any materially

exculpatory information.  The Court discusses each defect in turn.

    a.    The *Brady* Claims Fail Under the Law of the Case Doctrine.

---

[2] The Rigases voluntarily withdraw their clam that an August 9, 2002 letter discussing Adelphia's subscriber numbers was also *Brady* material.

First, the *Brady* Claims fail because they are procedurally barred, under the law of the case doctrine, by Judge Sand's denial of the Motion to Compel, which was affirmed on appeal.

i.    *Overview of the Law of the Case Doctrine.*

"The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *DiLaura Power Auth. of State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) (citation and quotation marks omitted).  Because "[t]he law of the case ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court, . . . section 2255 may not be employed to relitigate questions which were raised and considered on direct appeal.  Nevertheless, application of the doctrine remains a matter of discretion, not jurisdiction.  [The court] may find it appropriate to reconsider an earlier decision when confronted with an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *United States v. Becker*, 502 F.3d 122, 127 (2d Cir. 2007) (citations and quotation marks omitted); *see also Gordon v. United States*, 10-CV-5366, 2011 WL 2638133, at *4 n.5 (S.D.N.Y. July 1, 2011) (Wood, J.).

ii.   *The Law of the Case Doctrine Bars the Rigases From Claiming the Feeney Notes Are Brady Material.*

Judge Sand's ruling that the Government had no *Brady* obligation to disclose the Feeney Notes bars the Rigases from relitigating this point on collateral review.  Unlike when they litigated this point before Judge Sand, the Rigases now possess the materials they claim the Government should have disclosed—the Feeney Notes and the Scientific Atlanta and Motorola Notes.  However, none of these materials are "new evidence" that would permit an exception to the law of the case doctrine.  No other exception applies, either.

The Rigases' instant claim is the same one they made in the Motion to Compel.  Now, as

10

before, the Rigases claim that the Government had a *Brady* obligation to disclose the notes of its

pretrial interview with Rothenberger because the notes contained Rothenberger's allegedly

exculpatory statements about certain transactions and disclosures.  True, the Rigases' argument

that Rothenberger's statements were exculpatory is now supported by the Feeney Notes

themselves, whereas the Motion to Compel was supported by Rothenberger's testimony in a civil

proceeding.  Despite this different factual premise, the claim is precisely the same.  Judge Sand's

denial of this claim under the essential facts doctrine, which was affirmed by the Second Circuit,

bars the Rigases from relitigating this point now.  *See Baez v. United States*, 02-CR-8703, 2005

WL 106901 (S.D.N.Y. Jan. 19, 2005) (Batts, J.) ("A Section 2255 petition containing new

factual premises than those offered in the direct appeal may still be considered as requesting the

same 'ground' for relief, and thus, to have been thoroughly litigated on direct appeal."); *see also

Sanders v. United States*, 373 U.S. 1, 16 (1963) ("[I]dentical grounds may often be proved by

different factual allegations.").

     The "new evidence" exception to the law of the case doctrine does not apply.  The

Rigases claim the Feeney Notes are "new evidence" that undermines the Government's prior

representation that Rothenberger's exculpatory statements concerned only a single "timber

rights" transaction, and thus show that the exculpatory value of Rothenberger's statements was

much greater than Judge Sand believed.  But Judge Sand's ruling was not premised on the scope

or exculpatory value of Rothenberger's potential testimony.  It was premised on Judge Sand's

view that the Rigases knew that Rothenberger could testify about any of the transactions he

worked on at Adelphia, regardless of whether Rothenberger actually discussed these transactions

during his pretrial interview, or whether any of his statements turned out to be exculpatory.  *See

Rigas*, 2008 WL 144824, at *2.  Thus, the Feeney Notes do not present "new evidence" that is

11

relevant to Judge Sand's ruling.

The "new law" exception does not apply here, either.  The Rigases claim that the Second Circuit's decision in *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012), permits an exception to the law of the case doctrine.  According to the Rigases, *Mahaffy* clarified that the essential facts doctrine applies only when the defendant, in addition to knowing what facts were known to a potential witness, is able to present the witness' testimony to the trier of fact—which requires knowing what the witness would say if called to testify.  Thus, the Rigases claim, after *Mahaffy*, the essential facts doctrine does not apply to witnesses, like Rothenberger, who refuse the defendant's attempts to interview them before trial.  But this proposition is nowhere to be found in *Mahaffy*.  *Mahaffy* merely applies this Circuit's longstanding rule that a defendant does not have the "essential facts" about a witness unless the defendant, in addition to knowing the defendant's identity, knows that the witness may have exculpatory information.  *Id.* at 131 & n.11.  *Mahaffy* applies the essential facts doctrine without altering it, and thus does not provide a ground for revisiting Judge Sand's ruling.

Finally, as discussed *infra*, Judge Sand's ruling was not made in error, let alone "clear error."  Thus, the Court declines to revisit Judge Sand's ruling, which the Second Circuit affirmed more than ten years ago.[3]

iii.   *The Law of the Case Doctrine Bars the Rigases From Claiming the Scientific Atlanta and Motorola Notes Are Brady Material.*

For the same reasons discussed in the previous section, the Scientific Atlanta and Motorola Notes do not contain "new evidence" that would disturb Judge Sand's conclusion that

---

[3] The Rigases also argue Judge Sand's ruling must be revisited to avoid the "manifest injustice" brought about by the Government's bad faith assertions that the Feeney Notes did not contain exculpatory information.  The Court is not persuaded that the Feeney Notes contain exculpatory information, or that that the Government purposely deceived Judge Sand on this point.

the Rigases had the essential facts about the Scientific Atlanta and Motorola employees. *See Rigas*, 2008 WL 144824, at *2. None of the other exceptions to the law of the case doctrine apply, either.

      b.  The *Brady* Claims Also Fail Under the Essential Facts Doctrine.

Even if the Court were to consider the merits of the *Brady* Claims, it would reach the same conclusion as Judge Sand: under the essential facts doctrine, the Government had no *Brady* obligation to disclose the Feeney Notes or the Scientific Atlanta and Motorola Notes.

      i.    *Overview of the Essential Facts Doctrine.*

The essential facts doctrine qualifies the Government's *Brady* obligation. Under the essential facts doctrine, "no *Brady* violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987). This is because "the government ha[s] a duty to disclose only 'information which had been known to the prosecution but unknown to the defense.'" *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). A defendant has the "essential facts" if he knows the "identity and location" of a witness "and of the likelihood that [the witness] might give testimony helpful to his defense." *United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir. 1973).

If the defendant knows these "essential facts," the Government need not inform the defendant of the witness' exculpatory statements, or of the witness' willingness to testify to these statements at trial. *See Williams v. United States*, 503 F.2d 995, 998 (2d Cir. 1974). Instead, the defendant is expected to interview the witness or call the witness to testify, using a subpoena if necessary. *See United States v. Natale*, 526 F.2d 1160, 1171 (2d Cir. 1975); *see also United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975) ("Ruddock's identity and alleged

13

participation in the robbery were known to Stewart at least six weeks prior to his first trial.

Stewart could have interviewed Ruddock prior to that trial or called him as a witness at that

trial.")

> ii.     *Under the Essential Facts Doctrine, the Government Was Not Required To
>         Disclose the Feeney Notes.*

The Rigases argue that they lacked the "essential facts" to call Rothenberger because he

refused to speak to them before trial.  According to the Rigases, the "essential fact" that they did

*not* know was the content of "Rothenberger's account," which was:

> That even under the pressure to become a cooperating witness and provide an
> account that fit the government's narrative, Mr. Rothenberger (who the
> prosecution knew was refusing to be interviewed by the defense) was continuing
> to provide an account of events that was highly exculpatory.

(Rigas *Brady* Mem. at 46.)  The Rigases' argument is *not* that they did not know what facts were

known to Rothenberger, but rather that they did not know whether he would testify truthfully or

favorably, because they could not interview him.  The Rigases claim that, under these

circumstances, they could not have called Rothenberger to the stand.

The Rigases were not entitled to a *Brady* disclosure about Rothenberger to confirm that

his testimony would match their expectations.  Once a defendant knows the "identity and

location" of a witness "and of the likelihood that [the witness] might give testimony helpful to

his defense," the defendant is not entitled to a *Brady* disclosure merely to confirm and predict the

witness' testimony—regardless of whether the defendant has succeeded in interviewing the

witness.  *Ruggiero*, 472 F.2d at 604–05.  The law could not be otherwise, for "[t]he precise

testimony of any potential witness cannot be known until it is had."  *United States v. Matos*, 781

F. Supp. 273, 279 (S.D.N.Y. 1991) (Sweet, J.) (quoting *United States v. Beasley*, 582 F.2d 337,

339 (5th Cir. 1978)).  Before Rothenberger was called to testify, the Government did not "know"

14

how Rothenberger would testify any more than the Rigases did; even if the Rigases had interviewed Rothenberger, they still could not "know" beforehand that he would testify as they expected. The Rigases fail to identify any favorable evidence contained in the Feeney Notes that they did not already know. Thus, the Government did not have any knowledge the Rigases lacked for *Brady* purposes. If the Rigases wanted Rothenberger's testimony, "the obvious and logical course was to subpoena [him] and put [him] on the witness stand." *Ruggiero*, 472 F.2d at 605; *see also Natale*, 526 F.2d at 1171 (Government did not suppress evidence where witness "was continually available for interviewing, or, had he proved suddenly uncooperative, for subpoena").[4]

In support of their argument that a defendant cannot be expected to call a witness who refuses a pretrial interview, the Rigases cite the Second Circuit's statement in *Leka v. Portuondo,* that "to call a witness cold . . . would be suicidal." 257 F.3d 89, 103 (2d Cir. 2001). But *Leka* is not an essential facts case; it stands for the proposition that a last-minute disclosure of the name and address of a witness who possesses exculpatory information may not satisfy *Brady* if it leaves the defendant with insufficient time to interview the witness. *Id.* Under those circumstances, the defendant would have no idea of the content of the witness' potential testimony, so a "cold" direct examination would be "suicidal." *Id.* at 103. The Rigases were in a very different position because, as they admit, they knew what facts were known to Rothenberger. The Second Circuit made this very point in *DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006), when it held that a late disclosure of a witness' statements would impermissibly force a "suicidal" cold direct examination—*unless* the defendant already knew the facts about

_____

[4] The Second Circuit has suggested in dicta that a defendant who knows the essential facts may be entitled to some form of relief if he informs the court, prior to or during trial, that he wishes to interview a potential witness but cannot do so. *See Ruggiero*, 472 F.2d at 605. That situation is not now before the Court.

which the witness could testify, in which case the disclosure would be unnecessary.  *See id.* at 197–98.

Separately, the Rigases argue that, by disclosing that Rothenberger could give exculpatory testimony about the timber rights transaction, the Government impliedly told the Rigases that Rothenberger would not give exculpatory information about any other subject.  The Rigases claim they interpreted the Government's disclosure to mean that Rothenberger was giving a false, inculpatory narrative about every other subject.  As Judge Sand found, this position is not reasonable.  It bears emphasis that Rothenberger was the Rigases' securities lawyer, and that the Rigases were charged with securities violations.  If the Rigases knew about Rothenberger's extensive role at Adelphia before the Government made its pretrial disclosure, they knew about it afterwards.  The Government's disclosure did not rob the Rigases of their knowledge of Rothenberger's ability to testify, nor did it place the Government in the exclusive possession of any information.  Thus, it had no bearing on the Government's *Brady* obligation.

The Rigases cite *United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995), in support of their argument about the "partial" timber rights disclosure, but that case is readily distinguishable.  In *Payne*, the Second Circuit held that the Government's disclosure of some but not all of the *Brady* material in its possession was insufficient, even though the undisclosed material was located in the public court file.  The court reasoned that the defendant could not be expected to search the court file for further *Brady* material because the defendant had no idea that the undisclosed material existed and had no reason to believe the Government's disclosure was incomplete.  *Id.* at 1209.  Here, by contrast, the Rigases were well aware of the full scope of Rothenberger's knowledge.  Thus, they could not plausibly have been deceived by a "partial" disclosure.

Considering all this, the Court agrees with Judge Sand: the Rigases knew the "essential

facts" about Rothenberger, and thus were not entitled to a *Brady* disclosure of the Feeney Notes.

> iii.   *Under the Essential Facts Doctrine, the Government Was Not Required To Disclose the Scientific Atlanta and Motorola Notes.*

The Rigases argue they did not have the essential facts about the Scientific Atlanta and Motorola employees because the Rigases did not know that the employees could give exculpatory testimony. But, as Judge Sand noted, the very fact that the Rigases were attempting to speak with these witnesses prior to trial indicates that the Rigases knew who they were and knew the facts about which they might give testimony. Indeed, James Brown, Adelphia's Vice President of Finance, testified that the Rigases themselves were personally involved in the marketing support negotiations with these employees. Yet the Rigases made no attempt to procure their testimony by subpoena. Thus, the Government had no obligation to disclose the Scientific Atlanta and Motorola Notes.

> c.   The *Brady* Claims Also Fail Under *Brady* Itself.

Even if the essential facts doctrine did not apply to the Feeney Notes and the Scientific Atlanta and Motorola Notes, the Court would still find that the Government had no *Brady* obligation to disclose them, as they contain no materially exculpatory information.[5]

> i.   *Overview of the Brady Rule*

Under *Brady*, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *Coppa*, 267 F.3d at 135. "This duty covers not only exculpatory material, but also information that could be used to impeach a key government witness." *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154

---

[5] The Rigases suggest that, if the Court holds an evidentiary hearing, they may raise *Brady* arguments that are not presented in their § 2255 petition. The Rigases may not use this vague promise of future arguments to evade the rules governing successive habeas petitions. *See Torres v. Senkowski*, 316 F.3d 147, 151–52 (2d Cir. 2003) (discussing procedures applicable to successive habeas petitions brought under § 2255). To the extent the Rigases claim the Government failed to disclose unspecified *Brady* materials, their claims are denied.

(1972)).  Evidence that is "inculpatory as well as exculpatory" must be disclosed if "its exculpatory character harmonize[s] with the theory of the defense case."  *United States v. Triumph Capital Grp.*, 544 F.3d 149, 168 (2d Cir. 2008) (citing *United States v. Rivas*, 377 F.3d 195, 199–200 (2d Cir. 2004)).

"'Evidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different,' such that the failure to disclose 'undermine[s] confidence in the verdict.'"  *United States v. Certified Environ. Servs., Inc.*, 753 F.3d 72, 91 (2d Cir. 2014) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).  Materiality is evaluated in light of the entire record.[6]  *Triumph Capital*, 544 F.3d at 164 (citing *Agurs*, 427 U.S at 112).

ii.      *The Feeney Notes Do Not Contain Materially Exculpatory Information.*

The Rigases claim the Feeney Notes contain statements by Rothenberger that could have supported an advice of counsel defense.   "[T]o benefit from an advice-of-counsel defense, a party must show that he (1) 'honestly and in good faith' sought the advice of counsel; (2) 'fully and honestly laid all the facts before his counsel'; and (3) 'in good faith and honestly followed' counsel's advice, believing it to be correct and intending that his acts be lawful."  *United States v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012) (quoting *Williamson v. United States*, 207 U.S. 425, 453 (1908)).  Under this longstanding rule, a defendant cannot fail to fully inform his counsel of the facts underlying a transaction and then rely on his counsel's uninformed approval of that transaction.

---

[6] The Rigases mistakenly argue that, because the jury's verdict form asked whether the Rigases committed fraud with respect to various transactions, but did not specify which misrepresentations or omissions convinced the jury that fraud had occurred, evidence undermining any of the Government's theories would be "material." This standard of *Brady* materiality is directly contrary to this Circuit's "entire record" standard, and does not appear in either of the cases the Rigases cite in support of their argument—*Yates v. United States*, 354 U.S. 298 (1957) or *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011).

The Rigases argue that Rothenberger's statements could have supported their advice-of-counsel defense with respect to four disclosures: (1) Adelphia's disclosure of the Rigases' purchase, in 2000, of $375 million of Adelphia stock; (2) Adelphia's disclosure of its co-borrowed debt in the company's year-end 2000 Schedule 10-K; (3) Adelphia's disclosure of its transactions with "related parties," i.e., the Rigas family; and (4) the Rigases' disclosure that Adelphia paid for a golf course to be built on Rigas family-owned land.  With respect to each disclosure, the Court describes the relevant trial evidence, and then discusses whether Rothenberger's statements, as recorded in the Feeney Notes and other notes of his pretrial interview, would have been materially exculpatory.

    A.  <u>The 2000 Stock Purchase.</u>

First, the Rigases claim the Feeney Notes contain exculpatory statements relating to Adelphia's disclosure of a transaction, in 2000, in which they purchased $375 million of Adelphia stock.

    *1.*  *Trial evidence relating to the disclosure of the 2000 stock purchase.*

At trial, the Government argued that the Rigases failed to adequately report the financing mechanism they used to buy Adelphia stock.  At the relevant time, the Rigases wanted to raise capital by selling Adelphia shares to the public, but also wanted to purchase enough shares to maintain control of the company.  Adelphia's stock purchase agreements required buyers to pay for shares using "immediately available funds."  The Rigases did not have enough cash to pay for all the shares they wanted to buy.  *See Rigas*, 490 F.3d at 213–15.

To solve this problem, the Rigases caused Adelphia's subsidiaries to enter "co-borrowing" agreements with the RMEs, a group of corporate entities that were privately owned by the Rigases.  Under the co-borrowing agreements, either co-borrower (that is, Adelphia's

19

subsidiaries or the RMEs) could take out loans for which both co-borrowers would be jointly and severally liable.  When the Rigases wanted to buy Adelphia stock, they used internal journal entries to transfer co-borrowed debt from Adelphia's books to the books of the RMEs.[7]  Through this process, the RMEs assumed Adelphia's debt in exchange for the new stock, but Adelphia itself remained liable for the assumed debt.  *See id.* at 214.

As an example of this practice, the Government introduced evidence relating to a stock purchase that took place on January 21, 2000.  In that transaction, an RME purchased $375 million of Adelphia stock.  (Tr. 6764–66.)  The RME received the stock, and Adelphia made an internal journal entry stating that Adelphia received "a wire transfer and/or bank or other transfer of immediately available funds in the aggregate amount of $375 million."  (Tr. 4363–69, 6768– 71; Gov't *Brady* Mem. Ex. EE.)  No such transfer actually took place: instead, an Adelphia subsidiary drew down $368 million from a joint line of credit procured by the co-borrowers and sent $136 million of those borrowings to Adelphia.[8]  (Tr. 6777–88; Gov't *Brady* Mem. Ex. GG.).

The Government argued that the Rigases caused Adelphia to make several misleading disclosures about this transaction.  First, Adelphia reported, in a Schedule 13-D, that the source of the funds that the Rigases used to buy Adelphia's stock was "affiliate borrowings," without disclosing that Adelphia itself was the liable "affiliate."  (*Brady* 56.1 ¶ 84.)  Second, the stock purchase agreement, Adelphia's journal entry, and other documents connected with this transaction stated that Adelphia received $375 million of "immediately available funds" from the

---

[7] At other times, the Rigases would pay using cash borrowed from sources other than the co-borrowing facilities, and then cause Adelphia to use that money to pay off family debts.  *Rigas*, 490 F.3d at 214.

[8] The Adelphia subsidiary immediately returned the remaining $232 million to the lenders of the joint line of credit.  (Tr. 6777–88; Gov't *Brady* Mem. Ex. GG.)

RME, which was false because Adelphia had in fact received a cashless transfer of $136 million from one of Adelphia's subsidiaries.  (*Id.* ¶ 125.)

> 2.  *Evidence in the Feeney Notes relating to the disclosure of the 2000 stock purchase.*

The Rigases claim the Feeney Notes show that they relied on Rothenberger's fully-informed approval of the "affiliate borrowings" and "immediately available funds" language.

First, the Rigases claim the Feeney Notes show that Rothenberger knew that Adelphia was (or might be) liable for the "affiliate borrowings," but believed it was unnecessary to disclose this fact.  To the contrary, the Feeney Notes show that Rothenberger took the opposite position in his pretrial interview.  For example, when asked if he "knew what 'affiliate borrowings' were," Rothenberger answered "No."  (*Brady* 56.1 Ex. 17 ("Feeney Notes") at 2.)  When asked "would [it] be [a] significant issue" if the "'affiliate borrowings' [were] from [Adelphia] or guaranteed by [Adelphia]," Rothenberger answered "Yes."  (*Id.* at 3.)  Thus, Rothenberger clearly stated that he did not know that Adelphia was the liable "affiliate," and would not have approved the 13-D language if he had been fully informed.

The Rigases emphasize stray lines from the Feeney Notes in order to avoid the clear meaning of Rothenberger's statements.  They argue that a line stating "affiliate borrowings – Identify?  No, not by name – general description," means that Rothenberger believed it was unnecessary to identify the "affiliate" liable for the "borrowings."  (*Id.* at 2.)  At best, this statement reflects Rothenberger's view that, ordinarily, a Schedule 13-D need not identify the party liable for borrowing that is used to buy stock.  But Rothenberger clearly stated that, in the unusual case where the issuer of the stock also guarantees the borrowing, a more detailed disclosure would be necessary.  (*Id.*)  The Rigases also focus on Rothenberger's statement that

he sent an "early draft" of the Schedule 13-D to Chris Thurner, the Comptroller of the RMEs, and that Thurner "confirmed that 'affiliate borrowing' [was] accurate." (*Id.*)  All this passage proves is that Thurner told Rothenberger that the stock was paid for with "affiliate borrowing." It does not undermine Thurner's trial testimony that he did not tell Rothenberger the identity of the "affiliate," and it does not suggest that the Rigases were uninvolved in the misleading disclosures.[9]  (*Brady* 56.1 ¶ 90–91.)

Second, the Rigases claim the Feeney Notes show that Rothenberger believed that the phrase "immediately available funds" accurately described the cashless transfer of debt via journal entries that the Rigases used to buy stock.  The Rigases point out that, according to one set of Buchanan Ingersoll notes, Rothenberger thought the phrase "immediately available funds . . . usually means cash," but he "had not researched this precise issue and it could also mean other than just cash."  (*Id.* ¶ 130.)  But even if Rothenberger acknowledged in his interview that the phrase "immediately available funds" *could* apply to a cashless transfer of debt, it is clear he had no contemporaneous knowledge that the 2000 stock purchase involved anything other than cash.  The Feeney Notes state that Rothenberger "assumed immed[iately] avail[able] funds (i.e. cash) [were] transferred" because "the stock purchase agreement language called for it."  (Feeney Notes at 1.)  He stated that he "[f]irst heard about" the "cashless or part cashless purchases by [the Rigas family] of [Adelphia] stock" in April or May 2002.  (*Id.*)  These statements show that the Rigases never told Rothenberger that they were not paying cash for the stock, much less that they were buying Adelphia stock via transfers of debt for which Adelphia

---

[9] The Rigases also argue that Rothenberger knew that Adelphia might be the "affiliate," because he knew the co-borrowing loans were a likely source of the funds.  But the Rigases support this claim with citations to documents unrelated to Rothenberger's pretrial interview, which have no bearing on the exculpatory value of the Feeney Notes.  In any event, Rothenberger's express statement in his pretrial interview that he did not know that the stock had been purchased with co-borrowed funds greatly undermines the persuasive value of these documents.

was itself liable.

B.  <u>Adelphia's Disclosure of the Co-Borrowed Debt.</u>

Next, the Rigases claim the Feeney Notes contain exculpatory statements relating to Adelphia's disclosure of its co-borrowed debt in a 2000 year-end 10-K.

1.  *Trial evidence relating to the disclosure of co-borrowed debt.*

In Adelphia's 10-K for the year 2000, Adelphia disclosed that certain Adelphia subsidiaries had entered into co-borrowing agreements with the RMEs, under which each co-borrower was fully liable for any borrowing undertaken by either co-borrower.  Adelphia disclosed that the borrowing limit under these facilities was about $3.75 billion.  (*Brady* 56.1 ¶ 143.)

At trial, the Government argued that the Rigases misled investors by disclosing the borrowing limit but failing to disclose the amount that the RMEs had borrowed.  Brown testified that, in March 2001, Adelphia's auditors recommended that Adelphia disclose the actual amount of its borrowing under the co-borrowing facilities.  Timothy Rigas and Brown wanted to avoid this disclosure, believing it would have negative financial repercussions for Adelphia.  Brown persuaded the auditors that it was "more conservative" to disclose the borrowing limit, rather than the actual borrowing.  Brown testified that he knew this proposal was deceptive.  (*Id.* ¶¶ 144–48.)

Brown also testified that Rothenberger suggested that Adelphia should clarify, in the 10-K, that "amounts of indebtedness set forth for Adelphia and its subsidiaries do not include any amounts borrowed by the managed entity coborrowers under these credit facilities."  (*Id.* ¶ 154.) This language was not ultimately utilized in the 10-K.  (*Id.* ¶ 155.)

2.  *Evidence in the Feeney Notes relating to the disclosure of co-borrowed debt.*

23

The Rigases claim the Feeney Notes show that Rothenberger developed the disclosure language used in the 10-K; that Brown sought Rothenberger's advice about this disclosure; and that the Rigases were not involved in developing the language.

The Rigases focus on a passage from the Feeney Notes in which Rothenberger recounted a meeting with Tim Werth (Adelphia's Director of Accounting), Doug Malone (Adelphia's Director of External Reporting), and Brown, regarding "add language to [co-borrowing] description in fin[ancial] [statement] footnote," "risk disclosure," and "borrow up to full amount." (Feeney Notes at 7; *Brady* 56.1 ¶ 156). According to the Rigases, this passage shows that Rothenberger "was involved in the decision to use the disclosure language," that "neither Tim nor John Rigas was anywhere in that picture," and that Adelphia's officers properly sought Rothenberger's advice about the 10-K language. (Rigas *Brady* Mem. at 33.)

At best, this passage proves that Rothenberger discussed the co-borrowing disclosure with Brown, Werth, and Malone. It does not suggest that Rothenberger developed or approved the language that Adelphia used in its disclosure. In fact, Brown testified that Rothenberger advised him *against* making the limited, misleading disclosure that was ultimately used. (*Brady* 56.1 ¶ 154.) Nothing in the Feeney Notes contradicts Brown's testimony that Rothenberger was uninvolved in Brown's and Timothy Rigas' conversations about the misleading disclosure.

Moreover, the Feeney Notes show that Timothy Rigas and Brown never told Rothenberger the key facts underlying the disclosure of Adelphia's co-borrowed debt. When asked if he had had "[a]ny discussion re: use of other party's borrowing ability if borrow more than put up," Rothenberger answered, "No." (Feeney Notes at 7.) Thus, Rothenberger was unaware that the Rigases had borrowed far more through the co-borrowing facilities than the RMEs could support—the *raison d'etre* for the misleading disclosure.

C.  The Related Party Transactions.

Next, the Rigases claim the Feeney Notes contain exculpatory statements relating to Adelphia's disclosure of its "related party transactions" with the Rigas family and the RMEs.

1.  *Trial evidence relating to the disclosure of related party transactions.*

The Government argued at trial that the Rigases defrauded investors by failing to fully disclose many transactions between Adelphia, the Rigas family, and the RMEs.  These "related party transactions" included cash transfers from Adelphia to the Rigases for personal use, as well as the transfer of co-borrowed debt from Adelphia's books to the books of the RMEs.

At trial, various Adelphia employees explained the strategies the Rigases used to conceal the related party transactions from Adelphia's shareholders and independent directors.  The Rigases caused Adelphia to report all of their family's and the RMEs' debts to Adelphia in a single figure, calculated on a net basis, called a "related party receivable," rather than itemizing the amounts owed by individual RMEs and Rigas family members.  *See Rigas*, 490 F.3d at 215, 218.  This process of "netting" the related party transactions prevented shareholders from identifying the Rigas family's personal debts to Adelphia and distinguishing them from the debts of the various RMEs with which Adelphia did business.  *See id.*  In addition, some transactions were simply not reported at all.  (*Brady* 56.1 ¶ 167.)  Brown testified that Timothy Rigas was in charge of reporting the related party transactions.  (*Id.* ¶ 169.)

At closing, the Government argued that the "netting" and non-reporting practices violated securities law, which required each transaction between Adelphia and the Rigas family to be individually accounted for.  (*Id.* ¶ 165.)  The Government emphasized that "what's illegal about these looting transactions . . . [is] the failure to tell the public about this looting."  (*Id.* ¶ 168.)

2.  *Evidence in the Feeney Notes relating to the disclosure of related party transactions.*

25

The Rigases claim the Feeney Notes show that Rothenberger understood the extent of the related party transactions because he reviewed them with Malone, and that Rothenberger approved of the reporting of these transactions without any input from the Rigases.

In support of their claim that Rothenberger reviewed the related party transactions with Malone, the Rigases point out that Rothenberger affirmed that he made an "[e]ffort to determine if" there were "other related party transactions" that were "not otherwise disclosed." (*Brady* 56.1 ¶ 175.) Rothenberger stated that he "reviewed [the] 10-KA w[ith] [Malone]," who was "familiar w[ith] SEC reporting," and used a "net number" for the related party transactions based on information provided by Malone. (*Id.* ¶¶ 175, 177.) The Rigases state that, during this review, the related party transactions "were all set forth clearly in Adelphia's records" and were "all readily visible to Mr. Malone and Mr. Rothenberger." (Rigas *Brady* Mem. at 36.)

Other passages of the interview notes, however, flatly contradict the notion that Malone, a Rigas co-conspirator, fully informed Rothenberger about the Rigases' transactions with Adelphia. According to the Feeney Notes, Rothenberger was "[n]ever told about" any "[Adelphia] policy [John Rigas] draw up to $1M[illion]/month" from Adelphia," and he stated that these withdrawals "[s]hould be disclosed." (*Brady* 56.1 ¶ 181.) Rothenberger stated that he did not know about the movement of co-borrowed debt until March 2002. (Feeney Notes at 4.) According to a Buchanan Ingersoll lawyer's notes, Rothenberger "did not understand the mechanics of [Adelphia's Cash Management System] or that non-Adelphia entities could draw down on the Adelphia account," which rebuts the Rigases' claim that Rothenberger could "readily" review the related party transactions, rather than simply relying on Malone's representations. (*Brady* 56.1 Ex. 18 ¶ 18.).

Thus, Rothenberger never learned, from Malone or from anyone else, that the Rigases

26

were making large withdrawals from Adelphia and concealing these withdrawals by netting them against other transactions, such as the transfer of co-borrowed debt. Rothenberger's uninformed approval of the disclosures about the related party transactions would not have been exculpatory.

          D.   <u>The Golf Course Project</u>

Finally, the Rigases claim the Feeney Notes contain exculpatory statements relating to their failure to disclose that they owned the land on which Adelphia was building a golf course.

          *1.   Trial evidence relating to the disclosure of the golf course project.*

At trial, the Government presented Adelphia's use of $13 million to build a golf course on land owned by the Rigas family as a particularly egregious example of a related party transaction that should have been disclosed to Adelphia's shareholders or independent directors.

To prove the Rigases' failure to disclose the golf course project to shareholders, the Government introduced Adelphia's securities filings, which did not disclose any expenditure on the golf course. A shareholder testified that he never learned that Adelphia had constructed a golf course on Rigas-owned land, and that this information would have influenced his decision to invest in Adelphia. (Tr. 829–30.)

To prove the Rigases' failure to disclose the golf course project to Adelphia's independent directors, the Government introduced, through independent director Dennis Coyle, a provision of the Bylaws requiring transactions between Adelphia and one of the company's officers or directors to be fully disclosed to, and approved by, either the independent directors or the shareholders. (Tr. 1021–22.) Coyle testified that the Board never approved the expenditure of Adelphia funds to construct a golf course. (*Id.*)

          *2.   Evidence in the Feeney Notes relating to the disclosure of the golf course project.*

The Rigases claim they sought Rothenberger's advice about the golf course project, and

that he told them they need not disclose it to the Board until it was "structured."  They point to a portion of the Feeney Notes in which Rothenberger described a conversation with Timothy Rigas about "formulating ownership/operation of [the golf course]."  (Feeney Notes at 6.)  Timothy Rigas told Rothenberger the golf course was being constructed, primarily for corporate use, on land that was "2/3" owned by the Rigas family.  (*Id.*)  Rothenberger advised Timothy Rigas that Adelphia should own the golf course, "because [the] majority of [the] use [would be] for corporate purposes," but that "once structured," the golf course "would require [Board] Approval if [the Rigas Family] continued to own [the] land." (*Id.*)  According to the Rigases, "[t]hat time never arrived as construction of the course stopped in May 2002." (*Brady* 56.1 ¶ 203.)  The Government does not dispute that "structured" might mean "when construction is complete."

Rothenberger's statements about this conversation could support an advice-of-counsel defense; nonetheless, this portion of the Feeney Notes is not *Brady* material.  First, the Rigases unquestionably knew that Rothenberger gave them this advice.  Second, the Government presented many other equally compelling examples of undisclosed related party transactions, from Timothy Rigas' purchase of a hundred pairs of slippers with Adelphia money, to the Rigases' withdrawal of millions of dollars to pay off personal loans.  *Rigas*, 490 F.3d at 218.  Thus, the Government's failure to disclose Rothenberger's statements about this particular related party transaction does not undermine the Court's confidence in the jury's verdict.

The Rigases also claim the Feeney Notes show that Rothenberger believed the independent directors knew about the golf course project.  According to the notes of a Buchanan Ingersoll lawyer, Rothenberger stated that various directors visited the site and thus "knew there was a golf course." (*Brady* 56.1 ¶ 200.)  But the Government's position was not that the Rigases concealed the *existence* of the golf course; rather, it is that they failed to inform the independent

directors that it was being constructed with Adelphia money on Rigas-owned land.  The Feeney

Notes show that Rothenberger did not tell the independent directors who owned the land.

(Feeney Notes at 6.)  In any event, Rothenberger's statements, if offered in testimony, would

have been cumulative.  On cross-examination, an Adelphia employee testified that the

construction of the golf course was publicized in Adelphia's corporate newsletter and in local

newspapers.  (Tr. 3113–17.)  Thus, even without Rothenberger's testimony, the jury could have

inferred that the Board members were aware the golf course existed.

      iii.    *The Scientific Atlanta and Motorola Notes Do Not Contain Materially*
                  *Exculpatory Information.*

At trial, the Government argued that the Rigases caused Adelphia to engage in sham

"marketing support" transactions with two of its suppliers, Scientific Atlanta and Motorola, in

order to fraudulently improve Adelphia's EBITDA[10], an accounting metric used to measure a

company's financial performance.  The Government's allegations concerned both (1) the terms

of the marketing support transactions and (2) the timing of Adelphia's entry into the marketing

support transactions.

      A.  The Terms of the Marketing Support Agreements.

At trial, the Government alleged that the Rigases entered sham transactions with

Scientific Atlanta and Motorola in order to artificially improve Adelphia's EBITDA.

      1.   *Trial evidence relating to the terms of the marketing support agreements.*

At trial, Brown testified that the marketing support scheme arose in the summer of 2000,

when Timothy Rigas told Brown that Adelphia's operating expenses were higher than expected

due to the cost of marketing and installing digital cable services.  Brown and Timothy Rigas

---

[10] EBITDA is Earnings Before Interest, Taxes, Depreciation, and Amortization.

agreed to enter sham agreements with Scientific Atlanta in order to hide the effects of Adelphia's marketing costs on the company's EBITDA.  (Tr. 6119–22.)

The marketing support agreements worked as follows.  Adelphia already had an agreement in place to buy digital cable boxes from Scientific Atlanta.  Adelphia agreed to a $31 increase in the cost per box, which Adelphia recorded as a capital expense; and Scientific Atlanta agreed to pay Adelphia $31 for "marketing support" per box, which Adelphia recorded as revenue.  Because EBITDA accounts for revenue but not capital expenses, the net result was a $31 increase to Adelphia's EBITDA.  (*Brady* 56.1 ¶ 214.).  Although this transaction improved Adelphia's EBITDA on paper, it was a "wash transaction" without any genuine economic effect on either company: the price of the cable boxes did not actually increase, and Adelphia did not actually spend anything additional for marketing support.  (*Id.* ¶¶ 215, 217.)

The marketing support scheme was implemented through a pair of agreements that modified Adelphia's existing contract with Scientific Atlanta.  In one, Adelphia increased the price it would pay for cable boxes; in the other, Scientific Atlanta agreed to make marketing support payments.  Brown testified that he and Timothy Rigas split the transaction between two documents in order to conceal it from auditors.  (*Id.* ¶¶ 217–18.)

Adelphia eventually came to a similar agreement with Motorola, which also supplied Adelphia with cable boxes.  (*Id.* ¶ 214.)

     2. *Evidence in the Scientific Atlanta and Motorola Notes relating to the terms of the marketing support agreements.*

The Rigases claim the Scientific Atlanta and Motorola Notes contain statements that would prove that the marketing support agreements were not intended to defraud investors.

The Rigases argue that the Scientific Atlanta and Motorola Notes show that the Rigases

did not devise the terms of the marketing support agreements. The Rigases point to pretrial interview statements by Scientific Atlanta and Motorola employees that establish that both companies already had marketing support agreements in place with Charter Communications ("Charter"), an Adelphia competitor. (*Id.* ¶¶ 229, 252.) Other employees stated that Scientific Atlanta's and Motorola's marketing support agreements with Charter were implemented using two separate documents, and that both companies convinced Adelphia to model its marketing support agreements on the Charter agreements because they believed the two-document structure was lawful. (*Id.* ¶¶ 229, 259, 265, 267, 290.)

However, testimony establishing that Scientific Atlanta and Motorola helped Charter capitalize its marketing costs would not undermine Brown's testimony that the Rigases intended for the marketing support agreements to fool investors, or change the fact that Adelphia did not disclose the true purpose of these transactions. In other words, the fact that the Rigases found a willing (or even helpful) partner in Scientific Atlanta or Motorola does not exculpate them. This is particularly so considering Adelphia's economic leverage over these companies.

In addition, whether Scientific Atlanta or Motorola believed the arrangement was lawful would have no bearing on the Rigases' guilt. Even if it could, no one at either company stated that they thought *Adelphia* acted lawfully when it entered into the marketing support agreements. For example, a Motorola employee stated that he heard a "comment from . . . legal that said, we're accounting for it correctly. We're not [Adelphia's] auditors. If their auditors are comfortable with it, then so be it." (*Brady* 56.1 Ex. 51 at 21.) Thus, Scientific Atlanta's and Motorola's approvals of the marketing support agreements would not exculpate the Rigases.

    B.  The Timing of the Marketing Support Agreements.

At trial, the Government also argued that the marketing support transactions were doubly

31

fraudulent because the Rigases started recording marketing support payments before they even had a (fraudulent) agreement in place to receive them.

>    1.   *Trial evidence relating to the timing of the marketing support agreements.*

The Government alleged that the Rigases began recording non-existent marketing support payments to inflate Adelphia's EBITDA in August 2000, many months before Adelphia actually executed the marketing support agreements with either company.  (*Brady* 56.1 ¶¶ 293–95.) Brown testified that, to his knowledge, Adelphia had not begun discussing marketing support with these companies in the summer of 2000.  (*Id.* ¶ 296.)   Brown said Adelphia began these discussions in October 2000 because "we had nothing to document or support the entries that we had already booked and . . . we needed to have something to show the auditors before the year [end audit]."  (Tr. 6134–35.)  The documents implementing the marketing support payments were not executed until December 2000 and January 2001, when Adelphia had been using the phony payments to conceal its marketing expenses for several months.  (Tr. 6141, 6151–52.)

At trial, the defense sought to undermine Brown's testimony by introducing an internal Scientific Atlanta email,  dated August 11, 2000, in which a Scientific Atlanta employee stated that he had received the "go ahead to do [a] '[C]harter-like' marketing credit for Adelphia." (*Brady* 56.1 ¶ 298.)  This email was not admitted.  Instead, the parties stipulated that, as of August 11, 2000, Scientific Atlanta's internal correspondence indicated that the company was considering a marketing support agreement with Adelphia, but that the correspondence did not reflect the existence of a final agreement.  (*Id.* ¶ 304.)

>    2.   *Evidence in the Scientific Atlanta and Motorola Notes relating to the timing of the marketing support agreements.*

The Rigases claim the Scientific Atlanta and Motorola Notes undermine the timeline presented at trial.  The Rigases point to the interview statements of two Scientific Atlanta

employees that, on or shortly before a Scientific Atlanta-sponsored fishing retreat in the summer
of 2000, Dan Liberatore of Adelphia raised the topic of marketing support with Scientific
Atlanta.  (*Id.* ¶¶ 307–08.)  The Rigases argue they could have used those statements to impeach
Brown by showing that discussions between the two companies were underway in the summer of
2000.

At best, these statements prove that Scientific Atlanta was discussing marketing support
payments with Adelphia in the summer of 2000.  This would not contradict Brown's testimony:
on cross-examination, he acknowledged that conversations could have been taking place at that
time without his knowledge.  (*Id.* ¶ 297.)  More importantly, the Scientific Atlanta and Motorola
Notes do not show that Adelphia reached an agreement with either company about marketing
support in the summer of 2000.  Thus, the notes do not undermine the timeline presented at trial
through Brown's testimony and the parties' stipulation.

## II.     The Interference Claims

The Rigases claim the Government violated their rights by coercing Adelphia into
restricting their access to (1) counsel and (2) witnesses before and during trial.

### a.   The Government Did Not Restrict the Rigases' Access to Counsel.

"The Sixth Amendment guarantees the defendant the right to be represented by an
otherwise qualified attorney whom that defendant can afford to hire, or who is willing to
represent the defendant even though he is without funds."  *United States v. Stein*, 541 F.3d 130,
154 (2d Cir. 2008) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–
25 (1989)).  Included in this right is a protection "against unjustified governmental interference
with the right to defend oneself using whatever assets one has or might reasonably and lawfully
obtain."  *Stein*, 541 F.3d at 156.

Because the Sixth Amendment creates a right against the government, a private entity's actions can support a Sixth Amendment claim only if "there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may fairly be treated as that of the State itself." *Id.* at 146 (quoting *Jackson v. Metro Edison Co.*, 419 U.S. 345, 351 (1974)).  Such a nexus is found "when the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).  In addition, "if 'the relevant facts show pervasive entwinement to the point of largely overlapping identity' between the State and the entity that the plaintiff contends is a state actor," state action is established even if the government did not "coerce[] or even encourage[] the events at issue." *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004) (quoting *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 301, 303 (2001)).  Absent such "entwinement," however, the plaintiff must show that the state was "*responsible* for the *specific* conduct of which the plaintiff complains." *See Stein*, 541 F.3d at 146 (quoting *Blum*, 457 U.S. at 1004) (second emphasis added).

Here, the Rigases cannot show that the Government is responsible for the actions that allegedly deprived them of the funds to pay for counsel.  Thus, their claim fails.

  *i.*  *The DOJ Policies Do Not Establish State Action.*

First, the Rigases argue that the Government was responsible for Adelphia's decision not to advance their legal fees because it investigated Adelphia pursuant to a pair of DOJ guidance documents: the "Holder Memorandum" and the "Thompson Memorandum."

The "Holder Memorandum" was a June 1999 DOJ memorandum, promulgated by then-Deputy Attorney General Eric Holder, that provided guidance to federal prosecutors who were

considering bringing criminal charges against corporations.  (Interference 56.1 ¶¶ 27–28.)  The

Holder Memorandum set forth several "factors to be considered," such as the "nature and

seriousness of the offense," the corporation's "willingness to cooperate in the investigation of its

agents," and—most relevant to the Rigases' claims—"whether the corporation appears to be

protecting its culpable employees and agents," such as "through the advancing of attorneys fees."

(*Id.* Ex. 16.)  On January 20, 2003, the Holder Memorandum was superseded by a second DOJ

memorandum, this one promulgated by then-Deputy Attorney General Larry Thompson and

known as the "Thompson Memorandum."  (Interference 56.1 ¶ 34.)  The Thompson

Memorandum largely repeated the provisions of the Holder Memorandum.  (*Id.* Ex. 17.)

> The Rigases claim that these policies conditioned Adelphia's avoidance of indictment on
its denial of fee advancement, and thus coerced Adelphia into denying the Rigases' request.  This
argument is a nonstarter.  As this Court already held, the Holder Memorandum and the
Thompson Memorandum merely "suggest that prosecutors *might* consider fee advancement to an
indicted former employee non-cooperative, which *might* weigh in favor of corporate indictment."
*Rigas*, 2015 WL 3403861, at *13 n.15.  Without more, these policies do not prove that the
Government directed Adelphia to restrict the Rigases' access to fee advancement, or that
Adelphia's attempts to comply with them were state action.  *See id.*

> The Rigases' reference to *Stein* on this point is not persuasive.  In *Stein*, the Second
Circuit held that prosecutors deprived the defendants in an accounting fraud prosecution of their
right to counsel by pressuring their employer, the accounting firm KPMG, into limiting the fee
advancement KPMG would otherwise have provided to the defendants.  *See Stein*, 541 F.3d at
135.  True, in *Stein*, the Second Circuit affirmed the district court's finding that the "Thompson
Memorandum caused KPMG to consider departing from its long-standing policy of paying legal

fees and expenses of its personnel in all cases." *Id.* at 141.  But the court made clear that it was "the Thompson Memorandum *and* the prosecutors' conduct" that created the nexus that is necessary for a finding of state action, not the Thompson Memorandum alone.  *See id.* at 141–144 (emphasis added).  Thus, *Stein* does not stand for the proposition that private entities *per se* engage in state action when they cooperate with a prosecution conducted pursuant to the Thompson Memorandum (or the Holder Memorandum).[11]

### ii.    *The Prosecutors' Conduct Does Not Establish State Action.*

The Rigases also argue that, in addition to following the Holder Memorandum and the Thompson Memorandum, the Government took actions that coerced Adelphia into denying the Rigases' request for fee advancement.  According to the Rigases, these actions parallel the prosecutorial actions in *Stein* that "deliberately reinforced the threat inherent in the Thompson Memorandum" and made KMPG's decisions "a direct consequence of the government's overwhelming influence."  *Id.* at 136, 143.

The Rigases present a lengthy, convoluted narrative of prosecutorial pressure. Specifically, the Rigases contend that (1) the Government discouraged the Board from including legal fee advancement in the Rigases' severance package; (2) Adelphia nevertheless promised, in the May 23 Agreement, that it would advance the Rigases' legal fees; (3) the Government reacted to the May 23 Agreement's promise of fee advancement by threatening to indict Adelphia, causing Adelphia to scramble to develop a pretext for reneging on its promise; (4) the Board actually denied the Rigases' request that Adelphia advance their legal fees in order to

---

[11] In fact, the Thompson Memorandum was not yet in force during the events leading up to the Rigases' trial.  A key difference between the Holder Memorandum and the Thompson Memorandum is that the Thompson Memorandum was binding on all federal prosecutors, but the Holder Memorandum was not.  *United States v. Stein*, 435 F. Supp.2d 330, 338 (S.D.N.Y. 2006) (Kaplan, J.).  Thus, the Rigases' reliance on *Stein* to prove that the mere existence of the Holder Memorandum compelled companies to comply with all its terms is particularly unpersuasive.

avoid indictment, not because it believed the Rigases had breached their fiduciary duties; and (5)

the actions of the Special Committee's counsel, Covington, as well as the Government's

behavior in a criminal tax case against Adelphia, serve as further evidence of the Government's

pressure campaign.

None of these propositions hold up under scrutiny, or contradict this Court's prior

observation that "Adelphia's decision to deny fee advancement was explained convincingly by

the company's bylaws and its adversary bankruptcy proceeding against [the Rigases]." *Rigas*,

2015 WL 3403861, at *13.  A brief discussion of each of the Rigases' points follows.

### A.   Events Prior To the May 23 Agreement Do Not Suggest Improper Government Conduct.

The Rigases' narrative begins around May 16, 2002, just before the Rigases resigned

from Adelphia pursuant to the May 23 Agreement.  According to the Rigases, the Government

was unsatisfied with Adelphia's cooperation in its investigation of the Rigases and was

considering indicting the company.  (Interference 56.1 ¶¶ 54, 56.)

The Rigases claim that the Government began to discourage Adelphia from agreeing to

any severance package in which Adelphia would advance the Rigases' legal fees.  As evidence

of this pressure, the Rigases point to the minutes of the Board's May 18, 2002 meeting, during

which the Board discussed the terms of the Rigases' departure from Adelphia.  The minutes

contain a Board member's view that the Government might not agree to "certain severance

terms" if the Rigases did not cooperate with the Special Committee's investigation.  (*Id.* ¶ 61.)

But, read in context, this statement plainly refers to whether the Rigases would receive "salary,

benefits, use of an office, use of a secretary, and some benefits," not whether Adelphia would

advance their legal fees.  (*Id.* Ex. 24 at 2.)

The Rigases also point to the handwritten notes of several individuals present at the May 18, 2002 Board meeting, which describe a report about a previous meeting between the Government and Adelphia.  According to the notes of Bruce Booken, a Buchanan Ingersoll lawyer, the Government's "focus" in advance of the May 23 Agreement was to "stop flow $ or control flow $ to Rigas Family."  (Interference 56.1 ¶ 66.)  According to the notes of Carl Rothenberger, the Government was "focus[ed] on stopping [the] flow of assets . . . to [the Rigas] Family."  (*Id.* ¶ 67.)  These notes provide little support for the Rigases' view of events.  It is not clear who made any of the statements they record, and, more importantly, none states that the Government did not want Adelphia to advance the Rigases' legal fees.

B.  The May 23 Agreement Did Not Contain a Promise of Fee Advancement.

Shortly after the May 18, 2002 Board meeting, and allegedly under Government pressure to cut off the Rigases' access to legal fees, Adelphia signed the May 23 Agreement, which removed the Rigases from the Board.  Because the Rigases misrepresent the terms of the May 23 Agreement, it is necessary to briefly discuss the terms of that document.

The Rigases claim the May 23 Agreement promised that Adelphia would advance their legal fees, and frame Adelphia's subsequent refusal to advance their fees as a surprising reversal of this promise.   But the May 23 Agreement did not make an unconditional promise of fee advancement.  The May 23 Agreement merely promised the Rigases indemnification in accordance with Adelphia's Bylaws.  (*Id.* ¶ 81.)  The Bylaws, in turn, required Adelphia to advance its indemnified officers' legal fees upon written request, *unless* Adelphia or its counsel reasonably determined that the Rigases breached their duties to Adelphia or its shareholders.  (*Id.* ¶ 83.)  Thus, at best, the May 23 Agreement implicitly carried forward Adelphia's preexisting obligation to advance legal fees, subject to the conditions set out in the Bylaws.  It contained no

38

additional promise of fee advancement—in fact, the May 23 Agreement does not expressly mention legal fees at all.

The Rigases attempt to conflate Adelphia's obligation to advance their legal fees, which was conditioned on the Rigases' compliance with their fiduciary duties, with Adelphia's obligation to indemnify them, which was not.  But, as the bankruptcy court observed in Adelphia's proceedings against the Rigases, a company's obligation to indemnify an officer does not imply a concomitant obligation to advance that individual's legal fees.  *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 375–76 (Bankr. S.D.N.Y. 2005) (Gerber, J.) (citing *Advanced Mining Sys., Inc. v. Fricke*, 623 A.2d 82, 84 (Del. Ch. 1992)).  Given Adelphia's adversary position vis-à-vis the Rigases in the bankruptcy proceedings, it is unsurprising that Adelphia would choose not to advance their legal fees when released from the obligation to do so.

C.  The Rigases Fail To Show That the Government Placed Coercive Pressure On Adelphia in the Wake of the May 23 Agreement.

The Rigases claim the Government was angered by the May 23 Agreement's promise that Adelphia would advance the Rigases' legal fees, causing Adelphia to scramble to find a pretext to renege on its promise and avoid indictment.  Setting aside the fact that the May 23 Agreement simply did not make an unconditional promise of fee advancement, the Rigases' interpretation of events following the May 23 Agreement is unconvincing.

As evidence of the Government's alleged displeasure, the Rigases point to the notes of Board member Peter Metros at a May 25, 2002 Board meeting, which describe the Government's reaction to the May 23 Agreement.  Metros' notes recount a report to the Board by Mark Stein, a partner at the law firm Fried Frank, which served as Adelphia's outside counsel.  The notes state that the "Chief [of] Secu[rities]/Fraud" was "appalled at the Deal, couldn't fathom (1) severance

package, (2) 2 seats on the Board, (3) may indict the company."  (Interference 56.1 ¶¶ 88–91; *id.*

Ex. 33 at 4.)

Metros' notes do not even suggest that the Government's displeasure had anything to do

with Adelphia's position on fee advancement.  The notes do not mention legal fees at all.  The

references to a "severance package" and "2 seats on the Board" plainly refer, respectively, to a

provision of the May 23 Agreement that granted John Rigas a severance salary with benefits, and

a provision that enabled the Rigas family to designate two non-family members to be appointed

to the Board.  (Interference 56.1 ¶¶ 76, 80.)  The Court is convinced that the Government's

displeasure arose from these terms of the May 23 Agreement, rather than from a promise to

advance legal fees that the May 23 Agreement did not, in fact, contain.

Nonetheless, the Rigases claim Adelphia understood the Government to be "disgusted"

by its promise to advance their legal fees, and "quickly created [a] pretext" that would enable the

company to tell the Government it was reversing course.  The Rigases present the billing records

of several Fried Frank attorneys in an attempt to show that Adelphia spent the days between May

23, 2002, and June 1, 2002, discussing fee advancement with the Government.  The records

make scattered references to "indemnification" and "advancement," and make reference to

several meetings and teleconferences with the Government, but there is no evidence that any of

the Fried Frank lawyers' interactions with the Government had anything to do with fee

advancement.  (Interference 56.1 Ex. 34; Rigas Interference Mem. at 16 n.7.)[12]

     D.  <u>The Rigases Fail to Show That Adelphia's Decision Not to Advance Their</u>
<u>Legal Fees Resulted from Government Pressure.</u>

The Rigases' narrative culminates in their claim that Adelphia's June 1, 2002 denial of

---

[12] The Government's interpretation of the billing records—that Fried Frank was evaluating how Adelphia should
respond to the Rigases' request for fee advancement and indemnification—is reasonable.

their request that the company advance their legal fees resulted not, as the Board stated, from the Rigases' failure to disclose the related party transactions and refusal to cooperate with the Special Committee's investigation, but from Adelphia's acquiescence to the Government's campaign of pressure.  Their position is unconvincing.

The Rigases assert that the Special Committee's finding that the Rigases breached their duties to Adelphia was a sham, intended to conceal the company's true motivations.  But the Rigases identify no evidence in support of this claim.  Even by June 1, 2002, the basic outlines of the Rigases' wrongdoing would have been readily apparent, and the evidence shows that the Rigases refused to cooperate with the Special Committee's investigation.  For example, Adelphia's May 24, 2002 Form 8-K states that the Rigases "refused to review, or provide information for, this Form 8-K," and Covington's report of its internal investigation of Adelphia states that the Rigases refused to be interviewed.  (Respondent United States of America's Response to Petitioners' Statement of Undisputed Material Facts, and Counterstatement of Additional Facts Pursuant to Local Civil Rule 56.1 ("Gov't Interference 56.1") ¶ 378, ECF No. 201; Interference 56.1 Ex. 93 at 4.)  Although the Rigases attempt to cast doubt on the Special Committee's rationale by claiming that the Special Committee believed the Rigases had not engaged in any wrongdoing prior to the Government's pressure campaign, this claim is supported almost exclusively by their own self-serving declarations, much of which are hearsay. (Interference 56.1 ¶¶ 45–46, 51, 54–55, 63–64).  The Rigases fail to present persuasive evidence that the Special Committee's June 1, 2002 findings were pretextual.

The Rigases also fail to demonstrate a persuasive link between the June 1, 2002 decision to deny legal fees and the Government's alleged pressure campaign.  The minutes of the June 1, 2002 Board meeting report that Special Committee member Les Gelber stated that the

Government officials with whom Gelber had met "appeared satisfied at the progress of the

Special Committee." (*Id.* ¶ 99.) According to the Rigases, Gelber's report "directly connects the

government to the decisions that were being made," since the only change that took place since

the May 23 Agreement was the Board's decision not to advance the Rigases' legal fees. (Rigas

Interference Mem. at 17.) But, as this Court has already observed, these minutes make no

mention of advancing legal fees or indemnification at all. *See Rigas*, 2015 WL 3403861, at *13.

The minutes do not supply convincing evidence that the Government was "satisfied" because

Adelphia had acquiesced to the Government's demands about advancing legal fees.

### E.   Other Indicia of Improper Government Conduct.

The Rigases point to several other events that supposedly establish the Government's

improper attempt to deny the Rigases access to legal fees, including Covington's attempts to

persuade the Government not to indict Adelphia, and an alleged threat the Government made at

an unspecified time in late 2004. None is persuasive.

The Rigases claim that Covington's communications with the Government on the Special

Committee's behalf prove that Adelphia was improperly coerced into complying with the Holder

Memorandum and the Thompson Memorandum. They point to Covington's August 1, 2002

letter to the Government, in which Covington sought to persuade the Government not to indict

Adelphia. The Rigases highlight the letter's statement that Adelphia "has followed the [Holder]

Memorandum's guidelines to the letter," by, among other things, identifying responsible

executives, making witnesses available, and removing the Rigases from their positions at

Adelphia. (Interference 56.1 ¶¶ 144–46; *id.* Ex. 41.) The Rigases' position is undermined by

Covington's failure to list Adelphia's denial of fee advancement as an aspect of the company's

cooperation. Likewise, Covington's November 5, 2004 presentation to the Government, which

exhaustively detailed the contours of Adelphia's cooperation, is devoid of any mention of legal fees.  (Interference 56.1 ¶¶ 204–13; *id.* Ex. 55.)  If the Government had actually pressured Adelphia so heavily on the issue of fee advancement, Covington's omission on this point would be baffling.

The Rigases also point to a purported incident between the Government and the Special Committee's lawyer, Alan Vinegrad of Covington, which took place in late 2004, as further evidence of the Government's coercive practices.  According to a declaration by Adelphia's civil lawyer, Larry McMichael, Vinegrad advised McMichael about a threat he received from the Government.  At the time, some of the RMEs were indemnifying the Rigases and advancing their legal fees in a criminal tax case.  According to McMichael, the Government told Vinegrad that if the RMEs did not cease providing for the Rigases' legal defense, the Government would indict the RMEs.  (*Id.* ¶ 254.)  According to the Rigases, this "incident demonstrates how the government had no qualms about threatening to indict companies (particularly companies connected to the Rigases) in order to force the company to withhold indemnification and fee advancement."  (Rigas Interference Mem. at 30.)  The "threat" reported in McMichael's declaration is hearsay.  Even setting aside this evidentiary problem, a threat that the Government allegedly made in 2004 in a different prosecution is scarcely probative of the Government's conduct, under different circumstances, in 2002.

> b.  <u>The Government Did Not Restrict the Rigases' Access to Witnesses.</u>

The Rigases identify six witnesses who allegedly could have offered material and exculpatory testimony but were prevented from testifying by prosecutorial interference.  Four were Adelphia employees: Dean Marshall, Mike Brady, Andrew Zorichak, and Dan Liberatore.  Two were lawyers at Buchanan Ingersoll: Carl Rothenberger and Paula Zawadzki.

The Sixth Amendment guarantees criminal defendants the right to present a defense, which includes a right to call witnesses. *See United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000). Therefore, "judicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *Id.* To establish that the Government's restriction of a defendant's access to a witness violates the right to present a defense, a defendant must show "(1) 'that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means,' (2) 'bad faith on the part of the government,' and (3) that 'that the absence of fundamental fairness infected the trial.'" *United States v. Lebedev*, 932 F.3d 40, 55 (2d Cir. 2019) (quoting *Williams*, 205 F.3d at 29).

A defendant need not prove precisely what a witness would have said at trial in order to establish materiality if the government's conduct prevented the defendant from ever interviewing the witness. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 871 (1982). Nonetheless, a defendant "can establish no Sixth Amendment violation without making some plausible explanation of the assistance [the defendant] would have received from the testimony of the [missing] witness." *Id.*

Because the Sixth Amendment creates rights against only the government, a Constitutional violation exists only if the *prosecution* caused the defendant's difficulty in accessing the witness. *Soo Park v. Thompson*, 851 F.3d 910, 921 (9th Cir. 2017) ("[O]ur precedent clearly requires some 'causal link' between the government's conduct and the witness's decision not to testify . . .") (collecting cases); *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987) ("[A]n accused must, at a minimum, demonstrate some plausible nexus between the challenged governmental conduct and the absence of certain testimony."); *see*

*also United States v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002).

Here, the Rigases fail to show that the Government caused Adelphia or Buchanan Ingersoll to take any of the actions that allegedly prevented their employees from testifying, much less that the Government intended, in bad faith, for Adelphia or Buchanan Ingersoll to take these actions.

> i.      *The Rigases Fail to Demonstrate a Causal Connection Between Government Action and the Witness' Failure to Testify.*

The Rigases argue that the Government induced Adelphia and Buchanan Ingersoll to take a series of actions that barred the Rigases from calling the employees of these companies as witnesses.  Their position is unpersuasive.

> A.      <u>The Rigases Cannot Demonstrate a Causal Connection with Respect to the Adelphia Employees.</u>

The Rigases argue the Government, through Adelphia, barred them from accessing four former Adelphia employees who could have testified in their favor at trial: Dean Marshall, Mike Brady, Andrew Zorichak, and Dan Liberatore.

The Rigases argue that Adelphia's "Fisher Memorandum," which instructed Adelphia employees not to speak to the Rigases and to refer all communications with the Rigases to Adelphia's legal department, was adopted as a result of Government pressure.  The record does not support this claim.  As this Court observed in 2015, Adelphia's decision to issue the Fisher Memorandum was apparently "innocuous," and not indicative of prosecutorial interference. *Rigas*, 2015 WL 3403861, at *12.  When the Fisher Memorandum was issued, "Adelphia had sued Petitioners for millions of dollars. At that point, it was perfectly legal—and expected—for the company to funnel all communications from Petitioners through its counsel, without any pressure from the prosecution to do so."  *Id.*

The Rigases fail to present any evidence that casts the Fisher Memorandum in a more sinister light.  In fact, when deposed by the Rigases, Randal Fisher, the author of the Fisher Memorandum, testified that Adelphia's outside counsel, not the Government, had instructed him to adopt the positions set forth in the Fisher Memorandum.  (Gov't Interference 56.1 ¶ 363.) Fisher also stated that outside counsel never told him that these policies were to be implemented pursuant to a Government request.  (*Id.*)  This testimony corroborates AUSA Christopher Clark's statement, in Adelphia's bankruptcy proceedings, that "We have never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone."  (*Id.* ¶ 365.)

In addition to the Fisher Memorandum, the Rigases claim that there is other evidence that the Government pressured Adelphia to bar its employees from speaking to the Rigases.  The Rigases point to the deposition testimony of Dean Marshall (Adelphia's Director of Finance) that he did not speak with the Rigases because "the government did not want me communicating directly with anybody from the Rigas family."  (Interference 56.1 ¶ 175.)  But Marshall could not recall how he came to hold this view.  He did not know whether this information was conveyed to him directly or to his attorney.  (*Id.* Ex. 54 at 17.)  In a subsequent deposition, Marshall stated that he "was generally encouraged not to talk to anybody about this," but again could not be sure whether he heard this information directly or through counsel.  (*Id.* Ex. 90 at 109–11.)  As the Government points out, Marshall could just as well have heard the information from his lawyer, or some other third party, as from the Government.  Even the Rigases concede that "Marshall's uncertainty on this point would cut against making a finding of government involvement in the interference based on his testimony alone."  (Rigas Interference Reply at 22–23.)

The Rigases also argue that the circumstances under which Adelphia placed Marshall (and other Adelphia employees) on administrative leave on July 29, 2002, show that the

46

Government did not want Marshall to speak to the Rigases or testify.  The evidence is that, when

Adelphia determined that Marshall had engaged in wrongdoing, it intended to terminate his

employment; however, at the Government's request, it placed him on administrative leave

instead.  (Interference 56.1 ¶¶ 113, 128.)  As a condition of Marshall's administrative leave,

Marshall agreed not to disclose any confidential company information, except as required by law

or in compliance with his obligation to cooperate with the Government's investigation of

Adelphia.  (*Id.* ¶¶ 128–34.)  There is no evidence the Government pressured Adelphia into

including this boilerplate provision in the administrative leave agreement, much less that

prosecutors orchestrated Marshall's administrative leave for this purpose.  Although there are

emails showing that Adelphia's lawyers sought the Government's approval of Marshall's

administrative leave agreement, these emails do not show that the Government requested the

non-disclosure provision, or that it was devised to deny the Rigases access to Marshall's

testimony.  (*Id.* ¶¶ 135–39.)

There is no evidence that other Adelphia employees were pressured by the Government.

Zorichak states in his declaration that he believed Adelphia did not wish for him to speak with

the Rigases, but he never suggests the Government influenced Adelphia to take this position.

(*Id.* ¶¶ 170–74.)  There is no evidence supporting the Rigases' contention that the Government

sought to prevent anyone else from speaking with the Rigases.  The Rigases also claim that

several other Adelphia employees were placed on administrative leave and prevented from

testifying.  But the Rigases offer no explanation of what testimony they would have given that

would have assisted the Rigases.  Thus, the Rigases have not set forth a "plausible explanation of

the assistance [they] would have received from the testimony" of these individuals.  *Valenzuela-*

*Bernal*, 458 U.S. at 871.

B.  <u>The Rigases Cannot Demonstrate a Causal Connection with Respect to the Buchanan Ingersoll Lawyers.</u>

The Rigases also claim the Government prevented them from presenting the testimony of two partners at Buchanan Ingersoll: Rothenberger, who is discussed extensively in the *Brady* claims, and Paula Zawadzki.  As with the Adelphia employees, the Rigases offer no evidence that the Government had any role in causing Rothenberger and Zawadzki not to testify.

The Rigases state that witnesses from Buchanan Ingersoll refused to speak with the defense.  (Interference 56.1 ¶ 200.)  They cite the opinion of Peter Fleming Jr., lead defense counsel in their criminal trial, that their refusal was "shock[ing]."  (*Id.* ¶ 201.).   These facts do not support the inference that it was the Government that caused the witnesses to refuse to speak to defense counsel.

The Rigases also claim that emails between Buchanan Ingersoll and Adelphia's outside counsel prove that the Government was manipulating Buchanan Ingersoll.  The Rigases' evidence shows that, when the Rigases asked Buchanan Ingersoll for files relating to their case, Buchanan Ingersoll's lawyers sent their draft response to Adelphia's outside counsel, Boies Schiller.  Boies Schiller then sent the draft to the Government, in compliance with a preexisting agreement that Boies Schiller would inform the Government about such requests.  (*Id.* ¶¶ 193–96.)  At best, these emails show coordination between the Government, Buchanan Ingersoll, and Adelphia's lawyers on a matter tangential to Rothenberger's and Zawadzki's unwillingness to speak to the Rigases.  They do not indicate that the Government restricted the Rigases' access to any witness or to any documents.[13]

ii.      *The Rigases Cannot Show Bad Faith.*

---

[13] Likewise, the Rigases' description of coordination between the Government and Boies Schiller in bankruptcy proceedings pertaining to the Rigases is not probative of Government misconduct in the Rigases' criminal trial.

Even if the Rigases could show a nexus between prosecutorial conduct and any witness' failure to testify, their claims would still fail because they cannot show that the Government acted in bad faith.

Only prosecutorial actions taken in bad faith violate the right to present a defense. *See Williams*, 205 F.3d at 29. Thus, prosecutorial actions that prevent a witness from testifying, but were not "designed" to have this effect, do not implicate the defendant's right to present a defense. *Lebedev*, 932 F.3d at 55. Mere "[s]peculation . . . does not permit a determination of bad faith on the part of the prosecutor." *Buie v. Sullivan*, 923 F.2d 10, 12–13 (2d Cir. 1990).

At best, the Rigases show that the Government threatened to indict Adelphia if the company did not cooperate with its investigation. But, as this Court has observed, the Government was entitled to leverage the prospect of an indictment to secure Adelphia's cooperation, so long as it did not violate the Rigases' rights or encourage Adelphia to do so. *See Rigas*, 2015 WL 3403861, at *12. Even if Adelphia or its counsel took it upon themselves to restrict the Rigases' access to witnesses, and even if they did so with the goal of pleasing the Government, there is no evidence the Government intended, directed, or anticipated this result. Thus, the Rigases cannot show bad faith.

## CONCLUSION

The Rigases' motions for judgment on the *Brady* Claims and Interference Claims are DENIED. The Rigases' § 2255 petition is DISMISSED. The Court certifies that the Rigases have made a substantial showing of the denial of a constitutional right in both the *Brady* Claims and the Interference Claims and GRANTS a certification of appealability pursuant to 28 U.S.C. § 2253(c). The Clerk of Court is directed to close this case. Any pending motions are moot.

SO ORDERED.

49

Dated: New York, New York
      May 15, 2020

                                                   /s/ Kimba M. Wood
                                               KIMBA M. WOOD
                                 United States District Judge